**PROSPER LAW GROUP, LLP**
Gordon F. Dickson, Esq., SBN 136857
Deborah P. Gutierrez, Esq., SBN 240383
Vincent C. Granberry, Esq., SBN 276483
6100 Center Drive, Suite 1050
Los Angeles, California 90045
Telephone:   (310) 893-6200
Facsimile:   (310) 988-2930
Email:       deborah@prosperlaw.com

Attorneys for Plaintiffs,
Michael and Jeanine Rittenberg

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

CV11-10635CBM(ANx)

| | |
|---|---|
| MICHAEL RITTENBERG, an individual, and JEANINE RITTENBERG, an individual,<br><br>    Plaintiffs,<br><br>    vs.<br><br>DECISION ONE MORTGAGE COMPANY, LLC; WELLS FARGO BANK, N.A. D/B/A AMERICA'S SERVICING COMPANY; DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE FOR MORGAN STANLEY ABS CAPITAL I INC. TRUST 2007-HE2; MORGAN STANLEY MORTGAGE CAPITAL HOLDINGS, LLC; and Does 1 – 10, inclusive,<br><br>    Defendants. | Case No.<br>**COMPLAINT FOR:**<br><br>1. **DECLARATORY RELIEF [28 U.S.C. §§ 2201, 2202]**<br>2. **QUASI CONTRACT**<br>3. **VIOLATION OF 15 U.S.C. § 1692e**<br>4. **VIOLATION OF 15 U.S.C. § 1641(g)**<br>5. **VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17200, ET SEQ.**<br>6. **ACCOUNTING**<br>7. **BREACH OF CONTRACT**<br>8. **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br>9. **VIOLATON OF CALIFORNIA CIVIL CODE 2923.5 AND 2924**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

I.      STATEMENT OF THE CASE..............................................................3

II.     JURISDICTION, VENUE, AND PARTIES............................................4

III.    FACTUAL ALLEGATIONS...............................................................6

IV.     FIRST CAUSE OF ACTION – DECLARATORY RELIEF: TO DETERMINE STATUS OF
        DEFENDANTS' CLAIMS [28 U.S.C. §§ 2201, 2202].................................18

V.      SECOND CAUSE OF ACTION – QUASI CONTRACT......................................20

VI.     THIRD CAUSE OF ACTION – VIOLATION OF 15 U.S.C. § 1692e...................22

VII.    FOURTH CAUSE OF ACTION – VIOLATION OF 15 U.S.C. § 1641(g)................24

VIII.   FIFTH CAUSE OF ACTION – BUS. AND PROF. CODE SECTION 17200, ET SEQ.......29

IX.     SIXTH CAUSE OF ACTION – ACCOUNTING..........................................33

X.      SEVENTH CAUSE OF ACTION – BREACH OF CONTRACT.............................33

XI.     EIGHTH CAUSE OF ACTION – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH
        AND FAIR DEALING.......................................................................35

XII.    NINTH CAUSE OF ACTION – VIOLATION OF CALIFORNIA CIVIL CODE
        SECTIONS 2923.5 AND 2924.............................................................38

# COMPLAINT

COMES NOW Plaintiffs Michael and Jeanine Rittenberg ("Plaintiffs" or "Mr. and Mrs. Rittenberg"), by and through their counsel, for their Complaint against Defendants Decision One Mortgage Company, LLC (in its capacity as originating lender) (hereinafter "**Decision One**"), Wells Fargo Bank, N.A. d/b/a America's Servicing Company (in its capacity as purported mortgage servicer)(hereinafter "**Wells Fargo**"); Deutsche Bank National Trust Company, as Trustee for Morgan Stanley ABS Capital I Inc. Trust 2007-HE2 (in its capacity as rival claimant as purported beneficiary and assignee of Plaintiff's Note and Mortgage) (hereinafter "**Deutsche**"); and Morgan Stanley Mortgage Capital Holdings, LLC (in its capacity as rival claimant and investor in Plaintiff's Note and Deed of Trust)(hereinafter "**Morgan Stanley**"), pleads as follows:

## I.   STATEMENT OF THE CASE

1.    On September 18, 2006, Plaintiffs executed a promissory note ("Note") in favor of Decision One, in the amount of $528,000 secured by a deed of trust ("Deed of Trust" or "Mortgage") for the finance of real property located at 17954 West Petrel Ct., Santa Clarita, California 91387.  Subsequently, Defendants failed to assign or transfer Plaintiffs' Note to Deutsche and/or Morgan Stanley resulting in Defendants' inability to collect on the Note and enforce the Deed of Trust.  Despite Defendants' failure to perfect a security interest, Deutsche and/or Morgan Stanley have attempted to collect on this Note and enforce the Deed of Trust with the knowledge that they have no legal right to do so.  In addition to violating the Fair Debt Collection Practices and the Truth in Lending Act, Defendants knowingly concealed their lack of an enforceable security interest by fabricating and recording false documents in the Los Angeles County Recorder's Office.  Defendants' conduct is not only unfair and fraudulent, but also constitutes a violation of California Penal Code section 532(f)(a)(4).[1]  Through this

---

[1] Defendants' recording of the Assignment of Deed of Trust violates Cal. Penal Code section 532(f)(a)(4), which prohibits any person from filing a document related to a mortgage loan transaction

FEDERAL COMPLAINT                                                          -3-

1  action, Plaintiffs seek damages resulting from Defendants' unlawful conduct and a

2  declaratory judgment establishing that Defendants have failed to substantiate a perfected

3  security interest in the Note and Deed of Trust (collectively referred to as "Loan").

4  Simply put, Defendants have no legal, equitable, or pecuniary interest in the Loan.

5      2.    In the alternative, if the Court finds that any of the Defendants have an

6  enforceable security interest in either the Note or Deed of Trust, Plaintiffs maintain that

7  Defendants have breached Section 2 of the Deed of Trust and the Implied Covenant of

8  Good Faith and Fair Dealing, by charging improper fees and miscalculating and

9  misapplying payments to offset both principal and interest, in addition to the statutory

10 provisions listed above.

11 **II.    JURISDICTION, VENUE, AND PARTIES**

12     3.    This Court has original jurisdiction over the claims in this action based on

13 28 U.S.C. §§ 1331, 1343, 2201, 2202, 15 U.S.C. § 1641, 15 U.S.C. § 1692, and 42

14 U.S.C. § 1983, which confer original jurisdiction on federal district courts in suits to

15 address the deprivation of rights secured by federal law.

16     4.    This Court also has supplemental jurisdiction over the pendant state law

17 claims because they form a part of the same case or controversy under Article III of the

18 United States Constitution, pursuant to 28 U.S.C. § 1367.

19     5.    The unlawful conduct, illegal practices, and acts complained of and alleged

20 in this Complaint were all committed in the Central District of California and involved

21 real property that is located in the Central District of California.  Therefore, venue

22 properly lies in this District, pursuant to 28 U.S.C. § 1391(b).

23     6.    Plaintiffs are now, and at all times mentioned herein, citizens of California

24 residing in the County of Los Angeles.  At all times relevant to this action, Plaintiffs

25 have owned real property commonly known as 17954 West Petrel Ct., Santa Clarita,

26

27

28 with the county recorder's office which that person knows to contain a deliberate misstatement, misrepresentation, or omission.

California 91387 (the "Subject Property"), further described as Assessor's Parcel Number 2841-031-003, with the following description:

> LOT 14 OF TRACT NO. 47200-001 LOCATED IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 1234, PAGE(S) 13-26 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

7.     At all relevant times, Decision One Mortgage Company, LLC is a limited liability company organized under the laws of North Carolina with its main office in South Carolina.

8.     At all relevant times, Wells Fargo Company d/b/a/ America's Servicing Company is a national association organized under the laws of the United States with its main office in South Dakota.

9.     At all relevant times, Deutsche Bank National Trust Company, as Trustee for Morgan Stanley ABS Capital I Inc. Trust 2007-HE2, is a national banking association organized under the laws of the United States with its main office in California.

10.     At all relevant times, Morgan Stanley Mortgage Capital Holdings, LLC is a New York limited liability company with all of its members in New York and therefore is a citizen of New York.

11.     Plaintiffs are ignorant of the true identities and capacities of Defendants designated as Does 1 - 10, but will amend the Complaint when their identities have been ascertained according to proof within the time permitted. However, Plaintiffs allege on information and belief, that each and every Doe Defendant is in some manner responsible for the acts and conduct of the other Defendants, and were, and are, responsible for the injuries, damages, and harm incurred by Plaintiffs. Plaintiffs further allege on information and belief that each such designated Defendant acted, and acts, as the authorized agent, representative, and associate of the other Defendants in doing the things alleged herein.

12.     Whenever reference is made in this Complaint to any act of any Defendant(s), that allegation shall mean that each Defendant acted individually and jointly with the other Defendants.

13.     Any allegation about acts of any corporate or other business Defendant(s) means that the corporation or other business did the acts alleged through its officers, directors, employees, agents and/or representatives while they were acting within the actual or ostensible scope of their authority.

14.     At all relevant times, each Defendant committed the acts, caused or directed others to commit the acts, or permitted others to commit the acts alleged in this Complaint.  Additionally, some or all of the Defendants acted as the agent of the other Defendants, and all of the Defendants acted within the scope of their agency if acting as an agent of the other.

15.     At all relevant times, each Defendant knew or realized that the other Defendants were engaging in or planned to engage in the violations of law alleged in this Complaint.  Knowing or realizing that the other Defendants were engaging in or planning to engage in unlawful conduct, each Defendant nevertheless facilitated the commission of those unlawful acts.  Each Defendant intended to and did encourage, facilitate, or assist in the commission of the unlawful acts, and thereby aided and abetted the other Defendants in the unlawful conduct.

**III.      FACTUAL ALEGATIONS**

16.     On or about September 18, 2006, Mr. and Mrs. Rittenberg executed a Note and Deed of Trust in favor of Decision One obtaining a Loan secured by the Subject Property.

17.     On information and belief, Plaintiffs allege that shortly after the origination of their Loan, Decision One sold their Loan to another entity or entities.  Those entities are currently unknown but will be identified through discovery.

18.     Plaintiffs allege that these unknown entities and Defendants were involved in an attempt to securitize their Loan into the Morgan Stanley ABS Capital I Inc. Trust

2007-HE2 ("ABS Trust"). *See* **Exhibit "A,"** attached hereto is a securitization flow chart depicting the securitization process. In order for Plaintiffs' Mortgage to be a part of the ABS Trust, the entities involved were required to follow various agreements and established laws, including the Trust Agreement that governed the creation of the Trust. Plaintiffs allege the entities involved in the attempted securitization of Plaintiffs' Loan failed to adhere to the requirements of the Trust Agreement necessary to properly assign the mortgage loan into the Trust. As a result, Plaintiffs' Loan was not assigned to the ABS Trust and is therefore not part of the ABS Trust res. This fatal defect renders Defendants third-party strangers to the underlying debt obligation without the power or right to demand payment, declare default, negotiate Plaintiffs' Loan, and foreclose on the Plaintiffs' Property. Although Defendants are aware of this fact, they have and continue to act as if they have authority to demand payment, declare default, negotiate Plaintiffs' Loan, and foreclose on Plaintiffs' Property. Plaintiffs specifically dispute these facts.

19.     For approximately two years, Mr. and Mrs. Rittenberg made their monthly mortgage payments to Wells Fargo for approximately $3100 each month.

20.     On or around September 2008, Mr. and Mrs. Rittenberg experienced financial difficulties due to salary reductions and loss of expected income. Plaintiffs believed Wells Fargo would be willing to negotiate with them because they claimed they were happy to assist homeowners in negotiating loan modifications. Based on this belief, Plaintiffs began negotiating with Wells Fargo to modify their loan.

21.     On or around January 12, 2009, Wells Fargo sent a loan modification offer to Mr. and Mrs. Rittenberg. The loan modification offer consisted of a monthly payment of $2,992.41 with a required escrow of $654.45. The estimated new payment was $3,636.86, approximately $500 more than their previous monthly mortgage payments. Of course, Mr. and Mrs. Rittenberg declined the offer because they could not afford to make such a payment.

22.     Mr. and Mrs. Rittenberg spent the next eleven months submitting paperwork and speaking with various Wells Fargo representatives in an attempt to modify their loan.  Plaintiffs were consistently told they needed to update and resubmit documents.  In March 2009, Mr. and Mrs. Rittenberg sought assistance from legal counsel in the loan modification process.  After counsel proved to be unhelpful, Plaintiffs reinitiated communications with Wells Fargo.  Again, Plaintiffs were consistently told to update their paperwork and were assured their loan modification was under review.

23.     On or around November 2, 2009, Wells Fargo sent Mr. and Mrs. Rittenberg another loan modification offer consisting of a monthly payment of $2,184.05 beginning January 1, 2010; at a fixed yearly rate of 2%, not including any escrow.  The estimated new net payment including escrow was $2,838.50.  In addition, the loan modification required an upfront payment of $1,062.76.  The proposal stated it was valid for five days from the date of the letter.  The letter was dated November 2, 2009.

24.     On or around November 8, 2009, approximately six days from the date of the letter, Mr. and Mrs. Rittenberg received the loan modification proposal from Wells Fargo.  Plaintiffs immediately called Wells Fargo to inform them they received the letter days after the deadline established to accept the modification.  The Wells Fargo representative assured Plaintiffs they could still execute the loan modification agreement, despite the fact that the 5-day deadline had expired.

25.     Relying on the representations of the Wells Fargo representative, on or around November 20, 2009, Mr. and Mrs. Rittenberg executed the loan modification agreement and mailed the executed document, along with the payment of $1,062.76.

26.     On or around January 2010, Mr. and Mrs. Rittenberg received a monthly mortgage statement from Wells Fargo which displayed an amount inconsistent with the terms of the loan modification agreement.  Per the terms of the loan modification agreement, the only term that was consistent with the January monthly mortgage statement was the interest rate of 2%.  Concerned about the inconsistencies, Plaintiffs

1    called Wells Fargo and spoke to "Dave" regarding their January 2010 statement.

2    "Dave" assured Plaintiffs that they had been approved for the loan modification and the

3    discrepancies were likely a result of their system's "J Code" not being updated to reflect

4    the changes.

5         27.    On or around January 18, 2010, Mr. and Mrs. Rittenberg made a payment

6    of $2,838.50 based on their loan modification agreement and "Dave's" assurances.

7    However, on or around February 5, 2010, Plaintiffs received a monthly mortgage

8    statement from Wells Fargo stating their January payment had been unapplied and their

9    total payment due was $14,052.78.  The interest rate on the statement did reflect a rate

10   of 2%, per the terms of the loan modification agreement.

11        28.    On or around February 26, 2010, Mr. and Mrs. Rittenberg made another

12   payment of $2,838.50 based on the loan modification agreement.  However, on or

13   around March 1, 2010, Plaintiffs received another monthly mortgage statement from

14   Wells Fargo stating their February payment had been unapplied to their account and the

15   total payment due on March 1, 2010 was $9,368.52.  Again, the statement reflected an

16   interest rate of 2%, per the terms of the loan modification agreement.

17        29.    On or about July 2010, Mr. and Mrs. Rittenberg experienced another

18   unforeseen financial hardship due to another salary reduction.  Plaintiffs contacted Wells

19   Fargo to inform them of this development, and Wells Fargo, again, advised them that

20   they could apply for another modification.  Based on this representation, Plaintiffs re-

21   initiated loan modification negotiations, in an attempt to work out an affordable

22   payment.

23        30.    On or around January 2011, Mr. and Mrs. Rittenberg began a third loan

24   modification process.  Over the course of eleven months, Plaintiffs contacted Wells

25   Fargo two times each month for an update on the status of their loan modification and

26   was told each time it was under review. Plaintiffs were purportedly assigned numerous

27   Home Preservation Specialists to their case.  However, Plaintiffs were never able to

28

1   speak with their assigned Home Preservation Specialists and were always transferred to
2   other Wells Fargo representatives to discuss their loan modification.

3       31.    On or around June 29, 2011, Mr. and Mrs. Rittenberg were again
4   purportedly
5   assigned a new Home Preservation Specialist named "Quanterrio Leysath."  However,
6   as with their previous Home Preservation Specialists, Plaintiffs attempted to contact
7   "Quanterrio" several times each month to no avail.  Plaintiffs consistently spoke to other
8   purported members of "Quanterrio's" team and resubmitted their paperwork per their
9   instructions.  Plaintiffs were consistently reassured that their file was under review and
10  that the sale of their home would be postponed.

11      32.    On or around November 9, 2011, Mr. and Mrs. Rittenberg again attempted
12  to contact "Quanterrio" regarding their file and the Notice of Trustee's Sale set for
13  November 28, 2011.  Again, "Quanterrio" was not available and Plaintiffs spoke with
14  another Wells Fargo representative.  Over the next two weeks, Plaintiffs called Wells
15  Fargo every 3-4 days regarding their file and the related sale.

16      33.    On or around November 23, 2011, Mr. and Mrs. Rittenberg again contacted
17  Wells Fargo regarding their file.  Plaintiffs were again reassured their file was still
18  "under review" and the Notice of Trustee's Sale date would be postponed.

19      34.    On or around November 25, 2011, Mr. and Mrs. Rittenberg had not heard
20  from Wells Fargo regarding a postponement.  Plaintiffs again contacted Wells Fargo to
21  check the status of their file and the Notice of Trustee's Sale date.  Despite prior
22  representations that the sale date would be postponed, Plaintiffs were informed that
23  there was no change in their sale date and that the sale would proceed as scheduled.  Mr.
24  and Mrs. Rittenberg became extremely worried and asked to speak to a Wells Fargo
25  manager.  The Wells Fargo representative stated the manager was unavailable to speak
26  with them but she had looked at their file and determined their sale date would not be
27  postponed since they had been granted a loan modification in the past.  This was
28  extremely surprising news given that each Wells Fargo representative who they had

1   previously spoke with had never mentioned that their prior loan modification would

2   render them ineligible for another loan modification and postponement.  In fact, Wells

3   Fargo consistently told them they could qualify for another loan modification and

4   assured them the sale date would be postponed.

5         35.   On or around November 28, 2011, Plaintiffs filed bankruptcy in order to

6   save their home.

7         36.   On or around December 8, 2011, Plaintiffs received a letter dated

8   November 27, 2011 purportedly executed by "Quanterrio", in which he claimed that

9   Plaintiffs did not meet the requirements for a loan modification on the basis that he was

10   unable to reach Plaintiffs to discuss their situation.  This was patently false.  Plaintiffs

11   had made every effort to contact "Quanterrio" as instructed and "Quanterrio" never

12   made one effort to contact Plaintiffs.

13         37.   After months of negotiation, follow up phone calls, and resubmitting

14   documents many times over, Mr. and Mrs. Rittenberg felt they have been treated

15   unfairly and sought counsel to investigate why Wells Fargo had chosen to push them

16   into foreclosure.  Plaintiffs soon learned that Wells Fargo has no financial incentive to

17   modify loans given that they: (1) make more money through foreclosure than

18   modification and (2) that they have no legal authority to collect on this debt obligation

19   since Deutsche and/or Morgan Stanley has no beneficial interest in the Loan.  As such,

20   none of the Defendants have any legal right to collect on Plaintiffs' Loan, service the

21   Loan, or proceed with a lawful foreclosure.

22         38.   Plaintiffs' investigation has confirmed that there was an **attempt** to

23   securitize the Mortgage by assigning and transferring the Mortgage into the ABS Trust,

24   but the mortgage loan was never actually assigned and transferred to the ABS Trust.

25         39.   Based on Plaintiffs' investigation, Plaintiffs believe there are two purported

26   creditors to their Note and Mortgage.  The purported Assignment of Deed of Trust,

27   recorded on June 29, 2009, alleges Deutsche is the assignee of Plaintiffs' Note and

28   Mortgage.  However, the MERS Servicer Identification System alleges Morgan Stanley

1   is the investor of Plaintiffs' Note and Mortgage.  *See* **Exhibit "B",** a true and correct

2   copy of the MERS Servicer Identification System result for Plaintiffs' Note and

3   Mortgage.

4        40.    Plaintiffs allege that the Mortgage was never assigned or transferred, to any

5   of the parties involved in the securitization process.  Specifically, Plaintiffs allege that

6   their Note and Mortgage were never assigned to the Sponsor, Depositor, the ABS Trust,

7   or any of the Defendants as required by the Trust Agreement (a.k.a. the Pooling and

8   Servicing Agreement ("PSA")).

9        41.    Plaintiffs' information and belief is based on: (1) a title report and analysis

10   of the Subject Property's county records; (2) direct written and oral communication with

11   Defendants; (3) their counsel's research, experience, and extensive review of

12   depositions, case law, amicus briefs, correspondence, news articles, reports, complaints

13   by Attorneys General from various states, and publicly available securitization

14   documents and practices; (4) a search of Plaintiffs' Note and Mortgage on the MERS

15   Servicer Identification System; and (5) a review of the purported "Assignment of Deed

16   of Trust," executed by "David Seybold".

17        42.    Based on the analysis of the PSA, Plaintiffs believe and allege thereon that

18   their Note was supposed to be properly securitized into a mortgage-backed security that

19   is "pooled" together into a trust pool.  In this case, the Trust Agreement which governed

20   the creation of the ABS Trust is filed under oath with the Securities Exchange

21   Commission ("SEC") and is available online through the Edgar website at SEC.gov.

22   Section 10.03 of the PSA entitled, "Governing Law" is an election by the parties to the

23   ABS Trust that the Trust will be governed under the laws of the State of New York.  *See*

24   **Exhibit "C"**, a true and correct copy of section 10.03 of the PSA.

25        43.    Congress has recognized the importance of the trust's strict compliance

26   with the PSA and New York Trust Law.  Specifically, the Congressional Oversight

27   Panel, in its November 16, 2010, Oversight Report Examining the Consequences of

28   Mortgage Irregularities for Financial Stability and Foreclosure Mitigation determined,

"…[I]f the transfer for the notes and mortgages did not comply with the PSA, the transfer would be void, and the assets would not have been transferred to the trust." *See* **Exhibit "D",** attached hereto is a true and correct copy of the Congressional Oversight Panel's November 16, 2010 Oversight Report Examining the Consequences of Mortgage Irregularities for Financial Stability and Foreclosure Mitigation.  Plaintiffs allege their Note was not securitized properly and in accordance with the PSA and New York Trust Law.  As a result, the ABS Trust has no legal, equitable, or monetary interest in Plaintiffs' Note such that it can demand payment from them.

44.     Plaintiffs allege that the Note and Deed of Trust was not properly assigned to the ABS Trust on or before February 28, 2007, the required "Closing Date," as required by the terms of the Trust Agreement.  The "Closing Date" is the date by which all of the notes and mortgages must be transferred into the ABS Trust in order for the mortgage loan to be a part of the trust res.  As such, Mr. and Mrs. Rittenberg's Loan was never, and has never been, part of the ABS Trust res.  *See* **Exhibit "E"**, attached hereto is a true and correct copy of section 2.01 and 2.02 of the Trust Agreement containing these important requirements.

45.     Section 2.01 of the PSA outlines how mortgage loans are to be conveyed into the securitized mortgage trust.  Specifically, in connection with any assignment, Section 2.01(b)  requires:

> "…[T]he Depositor has delivered or caused to be delivered to Wells Fargo, in its capacity as Custodian, with respect to the WMC Mortgage Loans, LaSalle with respect to the Decision One Mortgage Loans and to the Trustee with respect to the NC Capital Mortgage Loans, for the benefit of the Certificateholders the following documents or instruments with respect to each Mortgage Loan so assigned:
>
> (i)     the original Mortgage Note bearing all intervening endorsements, endorsed "Pay to the order of _____, without recourse" and signed (which may be by facsimile signature) in the name of the last endorsee by an authorized officer. To the extent that there is no room on the face of the Mortgage Note for endorsements, the endorsement may be contained on an allonge, unless the Trustee or

applicable Custodian, as applicable, is advised in writing by the applicable Responsible Party (if required by the applicable Purchase Agreement) or the Depositor that state law does not so allow;

(ii)     the original of any guaranty executed in connection with the Mortgage Note, if any;

(iii)    the original Mortgage with evidence of recording thereon or a certified true copy of such Mortgage submitted for recording. If, in connection with any Mortgage Loan, the original Mortgage cannot be delivered with evidence of recording thereon on or prior to the Closing Date because of a delay caused by the public recording office where such Mortgage has been delivered for recordation or because such Mortgage has been lost or because such public recording office retains the original recorded Mortgage, the applicable Responsible Party shall deliver or cause to be delivered to the Trustee or applicable Custodian, as applicable, a photocopy of such Mortgage certified by the applicable Responsible Party, originator, the Depositor, title company, escrow company or attorney, as applicable, to be a true and complete copy of such Mortgage and shall forward to the Trustee or applicable Custodian, as applicable, such original recorded Mortgage within 14 days following the applicable  Responsible Party's receipt of such Mortgage from the applicable public recording office; or in the case of a Mortgage where a public recording office retains the original recorded Mortgage or in the case where a Mortgage is lost after recordation in a public recording office, a copy of such Mortgage certified by such public recording office to be a true and complete copy of the original recorded Mortgage;

(iv)    the originals of all assumption, modification, consolidation or extension agreements, with evidence of recording thereon or a certified true copy of such agreement submitted for recording;

(v)     the original Assignment of Mortgage for each Mortgage Loan endorsed in blank, which may, except with respect to the WMC Mortgage Loans, be included in a blanket assignment or assignments (except with respect to MERS Designated Mortgage Loans);

(vi)   the originals of all intervening assignments of Mortgage (if any) evidencing a complete chain of assignment from the applicable originator (or MERS with respect to each MERS Designated Mortgage Loan) to the last endorsee with evidence of recording thereon or a certified true copy of such intervening assignments of Mortgage submitted for recording, or if any such intervening assignment has not been returned from the applicable recording office or has been lost or if such public recording office retains the original recorded assignments of Mortgage, the applicable Responsible Party shall deliver or cause to be delivered a photocopy of such intervening assignment, certified by the applicable Responsible Party, originator, Depositor, title company, escrow company or attorney, as applicable, to be a true and complete copy of such intervening assignment and shall forward to the Trustee or applicable Custodian, as applicable, such original recorded intervening assignment within 14 days following the applicable Responsible Party's receipt of such from the applicable public recording office; or in the case of an intervening assignment where a public recording office retains the original recorded intervening assignment or in the case where an intervening assignment is lost after recordation in a public recording office, a copy of such intervening assignment certified by such public recording office to be a true and complete copy of the original recorded intervening assignment;

(vii)   the original mortgagee title insurance policy, a photocopy of the mortgage title insurance policy, or attorney's opinion of title and abstract of title, or, in the event such title policy is unavailable, a copy of the related policy binder or commitment for title from the title insurance company; and

(viii)   the original of any security agreement, chattel mortgage or equivalent document executed in connection with the Mortgage (if provided). ... *See* **Exhibit "E"**.

46.     In further violation of Section 2.01 of the Trust agreement, Defendants failed to deposit specific documents, such as all endorsed promissory notes, the original recorded mortgage, and an assignment to the Trustee with the Custodian of Records of the ABS Trust.  These documents were required to be deposited in order to complete the assignment and transfer of Plaintiffs' Note and Mortgage to the ABS Trust.

47.     Despite this failure to assign, transfer, and grant Plaintiffs' Mortgage to Deutsche and/or Morgan Stanley, Defendants have made numerous attempts to collect on Plaintiffs' mortgage and have now resorted to cover-up this fatal defect by executing and recording a fabricated Assignment of Deed of Trust ("Assignment").

48.     The Assignment was recorded on June 29, 2009 by David Seybold, as a purported "Assistant Secretary" for Mortgage Electronic Registration Systems, Inc. ("MERS").  This Assignment alleges that for "value received" MERS as Nominee for Decision One granted, assigned, and transferred to Deutsche, all beneficial interest in the Deed of Trust, together with "the money due and to become due thereon with interest, and all rights accrued or to accrue under said Deed of Trust."  Plaintiffs allege that no such transfer ever occurred, and that "David Seybold" lacked the corporate authority and personal knowledge required to sign on behalf of MERS.  Plaintiffs allege that "David Seybold" was never an employee of MERS.  Plaintiffs allege Defendant Deutsche and/or Wells Fargo instructed either David Seybold, or another agent who forged David Seybold's signature, to execute the Assignment in order to mislead Plaintiffs into believing Deutsche was assigned the interest in their Note and Mortgage.  Defendants Deutsche and/or Wells Fargo acted with the intent to illegally collect Plaintiffs' payments with the knowledge that the Assignment would not in fact legally grant, assign, or transfer Plaintiffs' interest to Deutsche.  *See* **Exhibit "F,"** attached hereto is a true and correct copy of Plaintiffs' Assignment of Deed of Trust.

49.     On or around December 6, 2011, after the initial investigation, Plaintiffs sent a Qualified Written Request ("QWR") to Wells Fargo in order to verify and validate their debt, pursuant to Real Estate Settlement Procedures Act, 12 U.S.C. § 2605(e).  The QWR requested documentation demonstrating who actually owned their Note, and the name, address, name of a contact person and telephone number of the owner of their mortgage Note.  *See* **Exhibit "G,"** attached hereto is a true and correct copy of Plaintiffs' Qualified Written Request.  The Dodd-Frank Wall Street Reform and

Consumer Protection Act ("Dodd-Frank Act")[2] requires that the servicer provide an acknowledgement of receipt of the QWR within five days of receipt, and to substantively respond within thirty business days of receipt.  To date, Wells Fargo has only acknowledged receipt of Plaintiffs' QWR.

50.     Plaintiffs do not dispute that they owe money on their mortgage obligation. Rather, Plaintiffs dispute the amount owed and seek the Court's assistance in identifying the true creditor and the amount they actually owe under the Note and Deed of Trust.

51.     Plaintiffs have been paying the wrong creditor and all payments made to the ABS Trust must be disgorged and refunded.

52.     Plaintiffs have been damaged as their credit and credit score were severely damaged.

53.     The title to Plaintiffs' home has been slandered, clouded, and its salability has been rendered unmarketable.

54.     Plaintiffs must seek the Court's assistance to identify their true creditor as they risk not obtaining clear title to this property should they be able to workout a payment plan or forbearance.

55.     Plaintiffs do not know who the current beneficiary of their Note and Mortgage actually is, such that they are now subject to double financial jeopardy.  Here, there are two entities identified as creditors of Plaintiffs' Note and Mortgage.  While the purported Assignment of Deed of Trust alleges Deutsche is the assignee of Plaintiffs' Note and Mortgage, the MERS Servicer Identification System alleges Morgan Stanley is

---

[2] The Dodd-Frank Act was signed into law on July 21, 2010.  The Act amended several statutes including 12 U.S.C. § 2605.  The Act amended 12 U.S.C. § 2605 by shortening the deadline to acknowledge a QWR from fifteen days to only five days and shortening the substantive response deadline from sixty days to thirty days.  There is a fifteen day extension allowed if the borrower is notified of the extension and the reasons for the delay.  In addition, the Dodd-Frank Act requires a servicer of a federally related mortgage to "respond to a QWR within 10 business days to a request from a borrower to provide the identity, address, and other relevant contact information about the owner or assignee of the loan." H.R. 4173 section 1463(a).  The Dodd-Frank Act provides available damages to an individual for failing to respond to a QWR request.  Available damages were increased from actual damages plus $1,000 to actual damages plus $2000.  The Dodd-Frank Act also prohibits various servicing practices and made a few changes to TILA.

1   the investor of Plaintiffs' Note and Mortgage.  Therefore, Plaintiffs are extremely

2   susceptible to double financial jeopardy.

3        56.    Plaintiffs have offered to and are ready, willing, and able to unconditionally

4   tender their obligation.[3]

5        57.    Not only are Plaintiffs ready, willing, and able to tender their obligation,

6   but they are also gainfully employed and have the ability to pay a reasonable payment to

7   fulfill their obligation.

8   **FIRST CAUSE OF ACTION – DECLARATORY RELIEF: TO DETERMINE**

9   **STATUS OF DEFENDANTS' CLAIMS [28 U.S.C. §§ 2201, 2202]**

10   **[Against All Defendants and Doe Defendants]**

11        58.    Plaintiffs hereby incorporate by reference each and every one of the

12   preceding paragraphs as if the same were fully set forth herein.

13        59.    Section 2201(a) of Title 28 of the United States Code states:

14        In a case of actual controversy within its jurisdiction, except
15        with respect to Federal taxes other than actions brought under
        section 7428 of the Internal Revenue Code of 1986, a
16        proceeding under section 505 or 1146 of title 11, or in any civil
        action involving an antidumping or countervailing duty
17        proceeding regarding a class or kind of merchandise of a free

18

19   [3] Case law makes clear that **Plaintiffs are only required to allege a credible offer of tender**,
20   not actually tender. *Alicia v. GE Money Bank*, No C 09-00091 SBA, 2009 WL 2136969 at *3 (N.D.
     Cal. July 16, 2009) ("...debtor must allege a credible tender of the amount of the secured debt...").
     Moreover, tender is *not* required when the owner's action attacks the validity of the underlying debt
21   because the tender would constitute an affirmation of the debt. *Sacchi v. Mortgage Electronic
     Registration Systems, Inc.*, No. CV 11-1658 AHM, 2011 WL 2533029 at *16 (C.D.Cal June 24, 2011)
22   (emphasis added) citing *Onofrio v. Rice*, 55 Cal. App. 4th 413, 424 (1997); *Stockton v. Newman*, 148
     Cal. App. 2d 558, 564 (1957). *See also Foulkrod v. Wells Fargo Financial California Inc.*, No. CV 11-
23   732-GHK (AJWx) (C.D. Cal. May 31. 2011) ("...requiring plaintiff to tender the amount due on his
     loan at this time would be illogical and inequitable given that he disputes that Wells Fargo has any
24   rights under the loan.").  The tender requirement does not apply because Plaintiffs are challenging the
     beneficial interest held by the assignees in deed of trust, "not the procedural sufficiency of the
25   foreclosure itself." *Vogan v. Wells Fargo Bank, N.A.*, No. CV 11-02098-JAM (KJN)(C.D. Cal.
     November 16, 2011)  In light of the fact that Plaintiffs contest the legitimacy of the Defendants' claim
26   to the mortgage payments, it would be *illogical and inequitable* to require Plaintiffs to actually tender
     the amount given that Plaintiffs dispute whether Defendants have any rights under the loan. *See
27   Onofrio v. Rice*, 55 Cal. App. 4th 413, 424 (1997).

28

FEDERAL COMPLAINT                                                              -18-

trade area country (as defined in section 516A(f)(10) of the Tariff Act of 1930), as determined by the administering authority, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

60.   Section 2202 of Title 28 of the United States Code states:

Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment.[4]

61.   Plaintiffs allege that Deutsche and/or Morgan Stanley do not have a secured or unsecured legal, equitable, or pecuniary interest in the lien evidenced by the Deed of Trust and that its purported assignment has no value since the Deed of Trust is wholly unsecured.

62.   On or around June 12, 2009, Defendant Deutsche claimed they were assigned and transferred a secured enforceable interest in, and a perfected lien against the Plaintiffs' Note, Deed of Trust, and Subject Property. Plaintiffs dispute this fact.

63.   Thus, the competing allegations made by Plaintiffs and Defendants, above, establish that a real and actual controversy exists as to the respective rights of the parties to this matter, including ownership of the Property.[5]

64.   In addition, the harm by Defendants is ongoing and includes the imminent foreclosure of Plaintiffs' home.  Therefore, as this claim relates to future harm, Plaintiffs' declaratory relief claim is cognizable as an independent cause of action.[6]

---

[4] It is axiomatic that a cause of action for declaratory relief serves the purpose of adjudicating *future* rights and liabilities between parties.  *See Cardellini v. Casey*, 181 Cal. App. 3d 389 (1986) [Emphasis added]; *Bachis v. State Farm Mutual Auto. Ins. Co.*, 265 Cal. App. 2d 722 (1968).

[5] "Declaratory relief is only appropriate '(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" *Guerra v. Sutton*, 783 F.2d 1371, 1376 (9th Cir. 1986).

[6] *See Seattle Audubon Soc'y v. Moseley*, 80 F.3d 1401, 1405 (9th Cir. 1996)("A declaratory judgment offers a means by which rights and obligations may be adjudicated in cases brought by any interested party involving an actual controversy that has not reached a stage at which either party may seek a coercive remedy and in cases where a party who could sue for coercive relief has not yet done so.").

65.     Accordingly, Plaintiffs request that the Court make a finding and issue appropriate orders stating that none of the named Defendants or Doe Defendants, have any right or interest in Plaintiffs' Note, Deed of Trust, or the Property which authorizes them, in fact or as a matter of law, to collect Plaintiffs' mortgage payments or enforce the terms of the Note or Deed of Trust in any manner whatsoever.

66.     Plaintiffs will suffer prejudice if the Court does not determine the rights and obligations of the parties because: (1) Plaintiffs will be denied the opportunity to identify their true and current creditor/lender and negotiate with them; (2) they will be denied the right to conduct discovery and have Deutsche's, Morgan Stanley's and/or Wells Fargo's claims verified by a custodian of records who has personal knowledge of the Loan and all transactions related to it; and (3) they will be denied the opportunity to discover the true amount they still owe minus any illegal costs, fees, and charges.

67.     Due to the actual case and controversy regarding competing claims and allegations, it is necessary that the Court declare the actual rights and obligations of the parties and make a determination as to whether Deutsche and/or Morgan Stanley's claims against Plaintiffs are enforceable and whether they are secured or unsecured by any right, title, or interest in Plaintiffs' Property.

68.     Furthermore, the conduct of Deutsche, Morgan Stanley, Wells Fargo, and/or one or more of the Doe Defendants, and each of them, as herein described, was so malicious and contemptible that it would be looked down upon and despised by ordinary people.  Plaintiffs are therefore entitled to punitive damages in an amount appropriate to punish Defendants and to deter others from engaging in similar conduct.

## SECOND CAUSE OF ACTION – QUASI CONTRACT

### [Against Deutsche, Morgan Stanley, Wells Fargo, and Doe Defendants]

69.     Plaintiffs hereby incorporate by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

70.     Deutsche and/or Morgan Stanley attempted but failed to become a party to the Note and Deed of Trust when it was purportedly assigned Decision One's interest in

Plaintiffs' Note and Deed of Trust.  Deutsche, Morgan Stanley and/or Wells Fargo demanded monthly mortgage payments from Plaintiffs starting in September 18, 2006 and continued to collect payments from Plaintiffs for approximately five years. Plaintiffs reasonably relied upon Deutsche, Morgan Stanley and/or Wells Fargo's assertion that they were entitled to payments.

71.     Deutsche, Morgan Stanley and/or Wells Fargo knowingly accepted payments and retained them for their own use knowing that Defendants did not acquire an interest in Plaintiffs' Note, such that they could accept or keep Plaintiffs' payments. It would be inequitable for Deutsche, Morgan Stanley and/or Wells Fargo to retain the payments it received from Plaintiffs which they did not have legal authority to collect. The equitable remedy of restitution when unjust enrichment has occurred is an obligation created by the law without regard to the intention of the parties, and is designed to restore the aggrieved party to his or her former position by return of the thing or its equivalent in money.

72.     Section 23 of the Deed of Trust states that: "Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee.  Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it."

73.     The obligations to Decision One under the Deed of Trust were fulfilled when Decision One received the balance on the Note as proceeds of the sale of Plaintiffs' Note and Mortgage to a presently unknown entity.  Deutsche, Morgan Stanley, and/or Wells Fargo have been unjustly enriched by collecting monthly payments from Plaintiffs when they have no interest their Note or Deed of Trust.

74.     Plaintiffs seek restitution for any payments they made to Deutsche, Morgan Stanley, and/or Wells Fargo that were not paid to the lender or beneficiary, if any.

///

///

## THIRD CAUSE OF ACTION – VIOLATION OF 15 U.S.C. § 1692e

### [Against Deutsche, Morgan Stanley, and Doe Defendants]

75.   Plaintiffs hereby incorporate by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

76.   Defendants Deutsche and/or Morgan Stanley have attempted to collect Plaintiffs' debt obligation and thus is a debt collector pursuant to the Federal Debt Collection Practices Act ("FDCPA").  "The term 'debt collector' means any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6).

77.   Federal law prohibits the use of "any false, deceptive, or misleading representation or means in connection with the collection of any debt… including the false representation of… the character, amount, or legal status of any debt… and the threat to take any action that cannot legally be taken…" 15 U.S.C. §1692e(2)(A), (5).

78.   Defendants attempted to collect on the Note under false pretenses, namely that Deutsche was assigned Plaintiffs' debt when in fact they were not.

79.   Deutsche and/or Morgan Stanley threatened to take action, namely engaging in collection activities that cannot legally be taken by them.

80.   As alleged herein, Plaintiffs' Note was not properly transferred to Deutsche and/or Morgan Stanley, who seeks to cause their purported authorized agent(s) to collect mortgage payments and engage in other unlawful collection practices.

81.   On information and belief, Deutsche and/or Morgan Stanley do not have a perfected security interest in Plaintiffs' Note such that they can enforce Plaintiffs' obligation and/or collect mortgage payments.

82.   Plaintiffs allege that Deutsche and/or Morgan Stanley falsely represented the status of Plaintiffs' debt and Defendants' ability to enforce Plaintiffs' debt obligation, in which they have no pecuniary, equitable, or legal interest.

83.    The conduct described above by Deutsche and/or Morgan Stanley, was malicious because Defendants knew that they were not acting on behalf of the current pecuniary beneficiary of the Note and Mortgage.  However, despite such knowledge, Defendants continued to demand and collect Plaintiffs' mortgage payments.

84.    On information and belief, Deutsche and/or Morgan Stanley engaged and are engaging in a pattern and practice of defrauding Plaintiffs, in that during the entire life of the mortgage Loan, Deutsche and/or Morgan Stanley failed to properly credit payments made, incorrectly calculated interest on the account, and failed to accurately debit fees.

85.    On information and belief, at all times material, Deutsche and/or Morgan Stanley had, and have, actual knowledge that Plaintiffs' account was not accurate, but that Plaintiffs would continue to make further payments based on Defendants' inaccurate account.  Plaintiffs made payments based on these improper, inaccurate, and fraudulent representations.

86.    The foregoing acts and omissions of Deutsche and/or Morgan Stanley and their agents constitute numerous and multiple violations of the FDCPA including, but not limited to, each and every one of the above-cited provisions of the FDCPA, 15 U.S.C. § 1692 et seq., with respect to Plaintiffs.

87.    Plaintiffs could not have reasonably known of the existence of a claim for violation of 15 U.S.C. § 1692e because Deutsche and/or Morgan Stanley, and their agents fraudulently concealed the fact that they were not entitled to enforce Plaintiffs' debt obligation and that they were falsely representing to Plaintiffs that the character and amount of money Plaintiffs still owed on their debt.[8]

---

[8] "If a reasonable plaintiff would not have known of the existence of a possible claim within the limitations period, then equitable tolling will serve to extend the statute of limitations for filing suit until the plaintiff can gather what information he needs." *Garcia v. Wachovia Mortg. Corp.*, 676 F.Supp.2d 895, 905 (2009) citing *Santa Maria*, 202 F.3d at 1178; see also *Stoll v. Runyon*, 165 F.3d 1238, 1242 (9th Cir.1999) ("Equitable tolling applies when the plaintiff is prevented from asserting a claim by wrongful conduct on the part of the defendant, or when extraordinary circumstances beyond the Plaintiff's control made it impossible to file a claim on time.") (citation omitted).

FEDERAL COMPLAINT                                                                      -23-

88.     As a result of Deutsche and/or Morgan Stanley's violations of the FDCPA, Plaintiffs are entitled to actual damages pursuant to 15 U.S.C. § 1692k(a)(1); statutory damages in an amount up to $1,000.00 pursuant to 15 U.S.C. § 1692k(a)(2)(A); reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1692k(a)(3); and declaratory relief, from each and every Defendant herein.

89.     Plaintiffs relied on Deutsche and/or Morgan Stanley's and their agents' misrepresentations and have been damaged in the following ways: (1) multiple parties may seek to enforce their debt obligation against them; (2) the title to their home has been clouded and its salability has been rendered unmarketable, as any buyer of Plaintiffs' home will find themselves in legal limbo, unable to know whether they can safely buy Plaintiffs' home or get title insurance; (3) they have been paying the wrong party for an undetermined amount of time and overpaid in interest that was over calculated; (4) they are unable to determine whether they sent their monthly mortgage payments to the right party; (5) their credit and credit score have been damaged; (6) they filed for bankruptcy to protect their home; and (7) they have been expended significant funds to cover the cost of attorneys' fees and related costs.

## FOURTH CAUSE OF ACTION -VIOLATION OF 15 U.S.C. § 1641(g)

### [Against Deutsche, Morgan Stanley and Doe Defendants]

90.     Plaintiffs hereby incorporate by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

91.     Plaintiffs reside in the subject Property and it is their principal residence.

92.     The new subsection (g) added to § 131 of TILA by section 404 of **The Helping Families Save Their Homes Act of 2009** states:

NOTICE OF NEW CREDITOR-
(1)     IN GENERAL. – In addition to other disclosures required by this title, not later than 30 days after the date on which a mortgage loan is sold or otherwise transferred or assigned to a third party, the creditor that is the new owner or assignee of the debt shall notify the borrower in

writing of such transfer, including-
    (A) the identity, address, telephone number of the new creditor
    (B) the date of transfer;
    (C) how to reach an agent or party having authority to act on
    behalf of the new creditor;
    (D) the location of the place where transfer of ownership of the
    debt is recorded; and
    (E) any other relevant information regarding the new creditor.

93.    Failure to comply with the requirements of this new subsection 131(g) of TILA may result in civil liability for actual damages, legal fees and statutory damages under section 130(a) of TILA.

94.    "The Helping Families Save Their Home Act of 2009," was expressly created by the legislature to avoid the secretive and purported "assignment" that took place here.  The congressional intent of the Act is clear – it was enacted to assist borrowers in identifying who their purported lender is, so that they could contact them if they needed assistance saving their home.   Here, Plaintiffs did not get that opportunity as they were not notified as mandated by this Act.

95.    Deutsche, as purported assignee of Plaintiff's Note and Deed of Trust, is purporting to be Plaintiffs' new creditor, as they are acting through their agent Wells Fargo to enforce Plaintiffs' Note and Deed of Trust have therefore violated 15 U.S.C. § 1641(g).[9]

96.    Morgan Stanley, as the other purported assignee of Plaintiff's Note and Deed of Trust, is purporting to be Plaintiffs' new creditor, as they are acting through their agent Wells Fargo to enforce Plaintiffs' Note and Deed of Trust have therefore violated 15 U.S.C. § 1641(g).

---

[9] Plaintiffs do recognize that the Ninth Circuit has found that a "trustee" is not a creditor as defined by TILA, *see Hargis v. Washington Mut. Bank,* No. 10-02341, 2011 WL 724390, at *2 (N.D. Cal. Fed. 22, 2011); however, there is an important distinction between a "foreclosing trustee" and "trustee" of a trust. "The trustee of a deed of trust enjoys limited liability because it only has two duties in the California statutory foreclosure process, but there is no legal basis to support a holding that limits the liability of all trustees in this manner." *Vogan v. Wells Fargo Bank, N.A.,* No. CV 11-02098-JAM (KJN) (C.D. Cal. November 16, 2011) Here, Deutsche is not the foreclosing trustee, but rather the trustee of a securitized trust pool. (PI's Compl. ∼∼[¶18, 29-33].) As such, Deutsche is claiming to be the creditor, not the foreclosing trustee under the Deed of Trust. Deutsche, as the creditor, cannot claim "creditor" status by collecting payments and enforcing the underlying security instrument and in the same breathe claim that they are not the creditor for purposes of TILA due to their "trustee" status.

FEDERAL COMPLAINT

97.   Here, Plaintiffs allege that Deutsche and Morgan Stanley are rival claimants in Plaintiffs' Note and Deed of Trust and creditors seeking to enforce their debt obligation, even though they do not have any ownership claim in the subject mortgage and are not entitled to payment, declare a default, or foreclose on Plaintiffs' home.

98.   On or around June 6, 2009, an Assignment was executed and recorded, listing Defendant Deutsche as the purported assignee of Plaintiffs' debt, as such, Defendant Deutsche is liable under TILA's notification guidelines.  Although Plaintiffs disputes the validity of Deutsche's claim, for the reasons stated herein, Deutsche was still required to follow the provisions of TILA as the purported new creditor.

99.   Deutsche purports to be a **creditor** under an alleged "assignment" and is alleged to have violated 15 U.S.C. § 1641(g).

100.   Plaintiffs allege that § 131(g) of TILA applies to Deutsche, as the purported and alleged **assignee** of Plaintiffs' Loan.  As the purported assignee of the Note, Deutsche would also be the creditor as they would "***stand in the shoes of the assignor***," i.e. the originating lender who was also the creditor.[10]

101.   Section 131(g) of TILA requires Deutsche and Morgan Stanley, as assignees and creditors, to perform and comply with the requirements of the statute or otherwise face statutory and civil penalties and damages.

102.   Neither Deutsche nor Morgan Stanley provided Plaintiffs with written notice within 30 days after the date on which they were allegedly assigned the mortgage.

103.   Mr. and Mrs. Rittenberg never received any notice indicating the exact date of the purported assignment of the interest in their Note, as required by § 131(g)(1)(B).

---

[10] An assignment operates to transfer to the assignee *all of the rights, title, or interest* of the assignor in the thing assigned. A transfer of all rights, title, and interests *conveys everything* that the assignor owned in the thing assigned and the assignee *stands in the shoes* of the assignor. *Knott v. McDonald's Corp.*, 985 F. Supp. 1222 (N.D. Cal. 1997).

104.   Mr. and Mrs. Rittenberg never received any notice indicating how to reach an agent or party having authority to act on Deutsche's behalf, as required by § 131(g)(1)(C).

105.   Mr. and Mrs. Rittenberg never received any notice indicating the location of the place where transfer of ownership of the debt is recorded, as required by § 131(g)(1)(D).

106.   Mr. and Mrs. Rittenberg never received any notice indicating any other relevant information regarding the new creditor, purportedly Deutsche and/or Morgan Stanley, as required by § 131(g)(1)(E).

107.   The doctrine of equitable tolling applies in cases in which a "reasonable plaintiff would not have known of the existence of a possible claim within the limitations period, then equitable tolling will serve to extend the statute of limitations for filing suit until the plaintiff can gather what information he needs." *Garcia v. Wachovia Mortg. Corp.*, 676 F.Supp.2d 895, 905 (2009) citing *Santa Maria*, 202 F.3d at 1178; *see also Stoll v. Runyon*, 165 F.3d 1238, 1242 (9th Cir.1999) ("Equitable tolling applies when the plaintiff is prevented from asserting a claim by wrongful conduct on the part of the defendant, or when extraordinary circumstances beyond the Plaintiff's control made it impossible to file a claim on time.") (citation omitted).

108.   Plaintiffs could not have reasonably known of the existence of a TILA violation, because Defendants fraudulently concealed the fact that they were purportedly assigned the interest in Plaintiffs' Note and Deed of Trust from MERS. Even though Wells Fargo is acting as the servicer of their Note and Deed of Trust, Plaintiffs were not given notice that their creditor had changed to Deutsche and/or Morgan Stanley. Based on this lack of notice, Plaintiffs could not have reasonably known of the existence of such a claim. Therefore, the doctrine of equitable tolling applies.

109.   The statute is clear: "Failure to comply with the requirements of this new subsection 131(g) of TILA may result in civil liability for **actual damages, legal fees and statutory damages** under Section 130(a) of TILA." In order to maintain a TILA

1    cause of action Plaintiffs must allege actual damages **and/or** legal fees **and/or** statutory

2    damages.[11]

3        110.   Deutsche and/or Morgan Stanley violated 15 U.S.C. § 1641 and are subject

4    to statutory damages, civil liability, penalties, attorneys' fees, and actual damages. *See*

5    15 U.S.C. § 1640.  Plaintiffs relied on Deutsche's and/or Morgan Stanley's

6    misrepresentations and has been damaged in the following ways: (1) multiple parties

7    may seek to enforce their debt obligation against Plaintiffs; (2) the title to their home has

8    been clouded and its salability has been rendered unmarketable, as any buyer of

9    Plaintiffs' home will find themselves in legal limbo, unable to know whether they can

10   safely buy Plaintiffs' home or get title insurance; (3) they have been paying the wrong

11   party for an undetermined amount of time and overpaid in interest that was over

12   calculated; (4) they are unable to determine whether they sent their monthly mortgage

13   payments to the right party; (5) their credit and credit score have been damaged; (6) they

14   filed for bankruptcy to protect their home; and (7) they have spent significant funds to

15   cover the cost of attorneys' fees and related costs.

16       111.   The actual pecuniary damages were proximately caused by Deutsche's

17   and/or Morgan Stanley's violations of 15 U.S.C. § 1641 and include, but are not limited

18   to, the over calculation and overpayment of interest on Plaintiffs' Loan, the costs of

19   repairing Plaintiffs' credit, the reduction and/or elimination of Plaintiffs' credit limits,

20   costs associated with removing the cloud on their property title, and attorneys' fees and

21   costs, in an amount to be proven at trial.

22

23

24   _____

25       [11] *See also, Pacific Shore Funding v. Lozo*, 138 Cal.App.4th 1342, 1350-1351 (2006) (remedies
     available for violation of 15 U.S.C. § 1640 include damages plus costs of attorney's fees); *King v.*

26   *Central Bank*, 18 Cal.3d 840, 848 (1997) (reversing trial court's order sustaining demurrer and finding
     lender liable under 15 U.S.C. § 1640 for "statutory penalties and attorney's fees"); *Chasnik v. BAC*

27   *Home Loans Servicing LP, et al*. No. CV 11-01324 DMG/JCGx (C.D. Cal, July 20, 2011) (denying
     motion to dismiss claim for violation of 15 U.S.C. § 1641(g) and finding that "TILA also provides for

28   statutory damages…in an amount not less than $400 or greater than $4,000. 15 U.S.C.
     § 1640(a)(2)(A)(iv).

1    112.   Plaintiffs are entitled to a private right of action to enforce 15 U.S.C. §

2   1641, et seq.

3                     **FIFTH CAUSE OF ACTION –**

4   **VIOLATION OF BUS. AND PROF. CODE SECTION 17200, ET SEQ.**

5   **[Against Deutsche, Morgan Stanley, Wells Fargo, and Doe Defendants]**

6    113.   Plaintiffs hereby incorporate by reference each and every one of the

7   preceding paragraphs as if the same were fully set forth herein.

8    114.   Defendants have engaged in unfair, unlawful, and fraudulent business

9   practices in the State of California, as set forth above.

10    115.   By engaging in the above-described acts and practices, Defendants have

11   committed one or more acts of unfair competition within the meaning of Bus. and Prof.

12   Code section 17200, et seq.

13    116.   Cal. Bus. and Prof. Code section 17200, et seq., prohibits acts of unfair

14   competition, which means and includes any unlawful, unfair or fraudulent business act

15   and conduct which is likely to deceive and is fraudulent in nature.

16    117.   Defendants Deutsche's and/or Morgan Stanley's conduct, for the reasons

17   stated therein, is in direct violation of 15 U.S.C. § 1692, et seq.

18    118.   Defendants Deutsche's and/or Morgan Stanley's conduct, for reasons stated

19   therein, is in direct violation of 15 U.S.C. § 1641, et seq.

20    119.   Defendants Deutsche's and/or Morgan Stanley's conduct, for reasons stated

21   therein, is in direct violation of Cal. Penal Code section 532(f)(a)(4).

22    120.   Defendants Deutsche and/or Morgan Stanley's engaged in unfair,

23   unlawful,[12] and fraudulent business practices with respect to mortgage loan servicing

24   and related matters.

25

26

27   _____

28   [12] "Unlawful" acts or practices are those forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, or court-made. *Saunders v. Superior Court*, 27 Cal. 4th 832 (1994); *Hewlett v. Squaw Valley*, 54 Cal. 4th 499 (1997).

121.   Defendants Deutsche, Morgan Stanley and/or Wells Fargo demanded and accepted payments for debts that were non-existent.

122.   Defendants Deutsche, Morgan Stanley and/or Wells Fargo reported payments as late to credit bureaus without the legal right or authority to do so.

123.   Defendants Deutsche and/or Morgan Stanley acted as a beneficiary without the legal authority to do so.

124.   Defendants Deutsche and/or Morgan Stanley facilitated, aided, and abetted the illegal, deceptive, and unlawful enforcement of Plaintiffs' Note and Mortgage and engaged in other illegal debt collection activities.

125.   Wells Fargo, acting as Plaintiffs' mortgage servicer, has been acting in a manner to mislead Mr. and Mrs. Rittenberg into believing that Wells Fargo had the authority to demand payments from them.

126.   As alleged herein, Plaintiffs' Note was not properly transferred to Deutsche and/or Morgan Stanley, who seek to cause their purported authorized agent(s) to collect mortgage payments and engage in other unlawful collection practices.

127.   On information and belief, Deutsche and/or Morgan Stanley do not have a perfected security interest in Plaintiffs' Note such that they can enforce Plaintiffs' obligation and/or collect mortgage payments.

128.   Plaintiffs allege, on information and belief, Deutsche and/or Morgan Stanley fraudulently enforced a debt obligation in which they had no pecuniary, equitable, or legal interest.  Deutsche's and/or Morgan Stanley's conduct is part of a fraudulent debt collection scheme.

129.   The conduct described above by Deutsche and/or Morgan Stanley, was malicious because Defendants knew that they were not acting on behalf of the current pecuniary beneficiary of the Note and Mortgage.  However, despite such knowledge, Defendants continued to demand and collect Plaintiffs' mortgage payments.

130.   On information and belief, at all times material, Deutsche and/or Morgan Stanley had, and have, actual knowledge that Plaintiffs' account was not accurate, but

1  that Plaintiffs would continue to make further payments based on Defendants'

2  inaccurate account.  Plaintiffs made payments based on these improper, inaccurate, and

3  fraudulent representations.

4       131.   As more fully described above, Defendants Deutsche's and/or Morgan

5  Stanley's acts and practices are unlawful.  This conduct is ongoing and continues to this

6  date.

7       132.   As more fully described above, Defendants Deutsche's and/or Morgan

8  Stanley's acts and practices are likely to deceive members of the public.  This conduct is

9  ongoing and continues to this date.

10      133.   As more fully described above, Defendants Deutsche's and/or Morgan

11 Stanley's acts and practices are unfair and the harm caused by their conduct outweighs

12 any benefit that their conduct may have.  This conduct is ongoing and continues to this

13 date.

14      134.   Plaintiffs allege that by engaging in the above described acts and/or

15 practices as alleged herein, Defendants violated several laws including Cal. Bus. and

16 Prof. Code section 17200, et seq. and must be required to disgorge all profits related to

17 their unfair, unlawful, and deceptive business practices.

18      135.   Plaintiffs allege that Defendants' misconduct, as alleged herein, gave them

19 an unfair competitive advantage over their competitors.  The scheme implemented by

20 Defendants is designed to defraud California consumers and enrich Defendants.

21      136.   The foregoing acts and practices have caused substantial harm to California

22 consumers, including Plaintiffs.

23      137.   By reason of the foregoing, Defendants have been unjustly enriched, by

24 collecting payments that they are not entitled to, and should be required to make

25 restitution to Plaintiffs and other California consumers who have been harmed, and/or

26 be enjoined from continuing in such practices pursuant to Cal. Bus. and Prof. Code

27 sections 17203 and 17204.

28

138.   As a direct and proximate result of the actions of Deutsche, Morgan Stanley and/or Wells Fargo, and each of them, stated above, Plaintiffs have been injured in that a cloud has been placed upon title to Plaintiffs' Property and Defendants have failed to remove this cloud from Plaintiffs' title.

139.   Plaintiffs request the Court to issue an order compelling Deutsche, Morgan Stanley and/or Wells Fargo, and any other Defendants claiming an interest in and to the Property to take any and all actions necessary to remove the cloud they have placed upon their title and an order enjoining such Defendants from taking such actions again in the future.

140.   As a direct and proximate result of the violations of Cal. Bus. and Prof. Code section 17200 by Defendants, Plaintiffs have suffered actual pecuniary damages, including, but not limited to civil liability, restitution, injunctive relief preventing Defendants from continuing to collect mortgage payments, and attorneys' fees, in an amount to be proven at trial.

141.   As a result of Deutsche's, Morgan Stanley's and/or Wells Fargo's violations of Cal. Bus. and Prof. Code section 17200, Plaintiffs have been damaged in the following ways: (1) multiple parties may seek to enforce their debt obligation against them; (2) the title to their home has been clouded and its salability has been rendered unmarketable, as any buyer of Plaintiffs' home will find themselves in legal limbo, unable to know whether they can safely buy Plaintiffs' home or get title insurance; (3) they have been paying the wrong party for an undetermined amount of time and overpaid in interest that was over calculated; (4) they are unable to determine whether they sent their monthly mortgage payments to the right party; (5) their credit and credit score have been damaged; (6) they filed for bankruptcy to protect their home; and (7) they have been expended significant funds to cover the cost of attorneys' fees and related costs.

///

///

## SIXTH CAUSE OF ACTION - ACCOUNTING

### [Against Deutsche, Morgan Stanley, Wells Fargo, and Doe Defendants]

142.   Plaintiffs hereby incorporate by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

143.   Deutsche and/or Morgan Stanley, and Wells Fargo as its purported agent, have held themselves out to be Plaintiffs' creditors and mortgage servicer.  As a result of this purported relationship with Plaintiffs, said Defendants have a fiduciary duty to Plaintiffs to properly account for payments made by Plaintiffs. [13]

144.   As a result of the aforementioned fraudulent conduct, Plaintiffs paid Deutsche, Morgan Stanley and/or Wells Fargo their mortgage payments for a period of approximately five years.  However, for the reasons stated herein, none of this money was actually owed to Deutsche and/or Morgan Stanley.  For that reason, these monies are due to be either credited to Plaintiffs in full or credited to the rightful owner of Plaintiffs' Note and Mortgage.

145.   The amount of the money due from Defendants to Plaintiffs is unknown to Plaintiffs and cannot be ascertained without an accounting of the receipts and disbursements of the aforementioned transactions.

## SEVENTH CAUSE OF ACTION - BREACH OF CONTRACT

### [Against Deutsche, Morgan Stanley, Wells Fargo, and Doe Defendants]

146.   Plaintiffs hereby incorporate by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

147.   In the alternative, if the Court finds that Deutsche and/or Morgan Stanley is a successor in interest to the Deed of Trust pursuant to the terms of the Deed of Trust,

---

[13] To state a cause of action for accounting, a plaintiff must allege the existence of a fiduciary relationship, or accounts so complicated that an ordinary legal action demanding a fixed sum is impracticable. 5 Witkin, Cal. Proc. 4th (1997) Pleading, section 775, p. 233.  The elements for a claim for accounting are:  (1) fiduciary relationship or other circumstances appropriate to the remedy; and (2) a balance due from the defendant to the plaintiff that can only be ascertained by an accounting. *See* Witkin, California Procedure, Pleadings, section 776, p. 233 (4th ed.).

FEDERAL COMPLAINT

Plaintiffs allege that Defendants Deutsche, Morgan Stanley, and/or Wells Fargo breached the Deed of Trust by improperly crediting and debiting their account.

148.   On September 18, 2006, Plaintiff obtained the subject mortgage loan from Decision One and executed a Note and Deed of Trust.

149.   Deutsche allegedly became a party to this contract when it was purportedly assigned MERS' interest in Plaintiff's Note and Deed of Trust.  Morgan Stanley allegedly became a party to this contract when it purportedly became an investor in Plaintiffs' Note and Deed of Trust.

150.   The Deed of Trust sets forth the dates that the monthly principal and interest payments were due and when late fees and other charges could be assessed.

151.   Section 2 of the Deed of Trust states that: "Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3.  Such payments shall be applied to each Periodic Payment in the order in which it became due."   *See* Exhibit **"H,"** attached hereto is a true and correct copy of the Deed of Trust.

152.   Plaintiffs substantially performed all of their conditions in the Deed of Trust.

153.   Defendants Deutsche, Morgan Stanley, and/or Wells Fargo breached the Deed of Trust by failing to apply the payments made by Plaintiffs in the order of priority set forth in Section 2, and this resulted in improper fees and taxes being added to the balance of the Loan.

154.   Plaintiffs were unaware that Defendants were failing to apply the payments in the way set forth in the Deed of Trust because Defendants fraudulently concealed this practice of applying Plaintiffs' mortgage payments to Plaintiffs' account.  Plaintiffs could not have reasonably discovered the impropriety of Defendants' behavior because these facts were hidden from them and were not disclosed throughout the servicing of their Loan.

155.   Plaintiffs could not have reasonably known of the existence of a breach of the Deed of Trust because Defendants fraudulently concealed the improperly applied mortgage payments, the incorrect calculation of interest, and the improper fees added to Plaintiffs' account that did not comply with Section 2 of Plaintiffs' Deed of Trust.

156.   As a proximate result of Defendants' breaches, Plaintiffs have suffered compensatory damages in an amount to be proven at trial.  Plaintiffs relied on Deutsche's, Morgan Stanley's and/or Wells Fargo's misrepresentations and have been damaged in the following ways: (1) multiple parties may seek to enforce their debt obligation against them; (2) the title to their home has been clouded and its salability has been rendered unmarketable, as any buyer of Plaintiffs' home will find themselves in legal limbo, unable to know whether they can safely buy Plaintiffs' home or get title insurance; (3) they have been paying the wrong party for an undetermined amount of time and overpaid in interest that was over calculated; (4) they are unable to determine whether they sent their monthly mortgage payments to the right party; (5) their credit and credit score have been damaged; (6) they filed for bankruptcy to protect their home; and (7) they have been expended significant funds to cover the cost of attorneys' fees and related costs.

## EIGHTH CAUSE OF ACTION – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### [Against Deutsche, Morgan Stanley, Wells Fargo, and Doe Defendants]

157.   Plaintiffs hereby incorporate by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

158.   In the alternative, if the Court finds that Deutsche and/or Morgan Stanley is a successor in interest to the Deed of Trust pursuant to the terms of the Deed of Trust, Plaintiffs allege that Defendants Deutsche, Morgan Stanley and Wells Fargo breached the implied promise of good faith and fair dealing by making it impossible for Plaintiffs to carry out their obligations under the contract because of the improperly applied payments and addition of interest and improper fees to their account.

159.   In every contract or agreement there is an implied promise of good faith and fair dealing.  Each party agrees to refrain from any action that would render performance of the contract impossible, and to do everything that the contract presupposes that each party will do to accomplish its purpose.[14]  The implied promise of good faith and fair dealing cannot create obligations that are inconsistent with the terms of the contract.[15]

160.   As alleged above, Plaintiffs entered into a contract (Deed of Trust) with Decision One and substantially performed the conditions under the Deed of Trust.

161.   Deutsche allegedly became a party to this contract when it was purportedly assigned MERS' interest in Plaintiffs' Note and Deed of Trust.  Morgan Stanley became a party to this contract when it purportedly became an investor in Plaintiffs' Note and and Deed of Trust.

162.   Defendants enjoyed substantial discretionary power affecting the Plaintiffs' rights under the Deed of Trust as detailed throughout this Complaint.  Defendants are required to exercise such power in good faith.

163.   Defendants breached their duty of good faith by interfering with Plaintiffs' ability to perform their obligations under the contract because Defendants improperly applied mortgage payments, incorrectly calculated interest, and improperly added fees to Plaintiffs' account making it impossible for Plaintiffs to ever fulfill their obligations.

---

[14] *April Enters., Inc. v. KTTV*, 147 Cal. App. 3d 805, 816 (1983); *Harm v. Frasher*, 181 Cal. App. 2d 405, 417 (1960).

[15] "There is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." *Comunale v. Traders & General Ins. Co.*, 50 Cal.2d 654, 658 (1958) (internal citation omitted). "The covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the *benefits of the agreement actually made*.  The covenant thus cannot " 'be endowed with an existence independent of its contractual underpinnings.' " " It cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." *Guz v. Bechtel National, Inc.*, 24 Cal.4th 317, 349-350 (2000) (citations omitted).

Defendants' failure to cooperate allowed them to collect more money from Plaintiffs than they were owed.[16]

164.   Plaintiffs could not have reasonably known of the existence of a breach of the implied covenant of good faith and fair dealing claim because Defendants fraudulently concealed the fact that they were not applying payments in accordance with the Deed of Trust thereby interfering with the Plaintiffs' ability to perform under the contract.  Defendants concealed the improperly applied mortgage payments, the incorrect calculation of interest, and the improper fees added to Plaintiffs' account and continued to render Plaintiffs' performance of the contract impossible.

165.   As a proximate result of Defendants' breaches, Plaintiffs have suffered general and special damages in an amount to be proven at trial.

166.   Plaintiffs relied on Deutsche's, Morgan Stanley's and/or Wells Fargo's misrepresentations and has been damaged in the following ways: (1) multiple parties may seek to enforce their debt obligation against them; (2) the title to their home has been clouded and its salability has been rendered unmarketable, as any buyer of Plaintiffs' home will find themselves in legal limbo, unable to know whether they can safely buy Plaintiffs' home or get title insurance; (3) they have been paying the wrong party for an undetermined amount of time and overpaid in interest that was over calculated; (4) they are unable to determine whether they sent their monthly mortgage payments to the right party; (5) their credit and credit score have been damaged; (6) they filed for bankruptcy to protect their home; and (7) they have been expended significant funds to cover the cost of attorneys' fees and related costs.

///

///

///

---

[16] Witkin, Summary of California Law, Contracts, §744 (8th ed.); *see also Sutherland v. Barclays American/Mortgage Corp.*, 53 Cal. App. 4th 299, 314 (1997); *Harm v. Frasher*, 181 Cal. App. 2d 405, 415 (1960).

FEDERAL COMPLAINT

## NINTH CAUSE OF ACTION –

## VIOLATION OF CALIFORNIA CIVIL CODE SECTIONS 2923.5 AND 2924

### [Against Deutsche, Morgan Stanley, Wells Fargo, and Doe Defendants]

167.   Plaintiffs hereby incorporate by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

168.   Plaintiffs allege that all times mentioned herein the Subject Property was their owner-occupied residence and that Plaintiffs were a member of the class of persons protected under Civil Code Sections sections 2923.5 and 2924.  Plaintiffs allege further that at all times mentioned here Defendants had a duty to comply with the foreclosure avoidance and workout plan requirements of Civil Code Section section 2923.5. Plaintiffs further allege that Old Republic National Title Ins., as the purported foreclosing trustee, was at all times herein an agent to both Plaintiffs and the remaining defendants, and that Old Republic National Title Ins. had a duty to Plaintiffs to ensure that the foreclosure on the Subject Property was conducted fairly and according to prescribed statutory procedures, including those contained in Civil Code sections 2923.5 and 2924.

169.   A Notice of Default was purportedly executed on May 22, 2009 and recorded in the Los Angeles Recorder's Office on May 27, 2009 by "NDEX West, LLC" as purported "Agent for Beneficiary."  The beneficiary to Plaintiffs' Note and Deed of Trust is unknown.  Notably, there is no evidence, recorded or otherwise, of a Substitution of Trustee which purports substitute NDEX West, LLC for Old Republic National Title Ins., the Trustee explicitly named in the Deed of Trust.  Accordingly, Plaintiff believes and thereon alleges, the Notice of Default is invalid and NDEX West, LLC did not have the authority to cause the Notice of Default to be recorded on May 27, 2008.

170.   A second Notice of Default purportedly executed on January 26, 2011 and recorded in the Los Angeles Recorder's Office on January 28, 2011 by "NDEX West, LLC" as purported "Agent for Beneficiary" is also invalid.  The beneficiary to

FEDERAL COMPLAINT

Plaintiffs' Note and Deed of Trust is unknown and there is no evidence, recorded or otherwise, of a Substitution of Trustee which purports substitute NDEX West, LLC for Old Republic National Title Ins., the Trustee explicitly named in the Deed of Trust. Accordingly, Plaintiff believes and thereon alleges, the second Notice of Default is invalid and NDEX West, LLC did not have the authority to cause the Notice of Default to be recorded on January 28, 2011.

171.   Plaintiffs allege on information and belief that because Deutsche and/or Morgan Stanley, by not having been assigned otherwise transferred Plaintiffs' Note and Deed of Trust nor having recorded the Deed at the time the Notice of Default was issued, was not the lawful Beneficiary, and could not cause the Notice of Default to be executed.  Moreover, NDEX West, LLC did not have the authority to execute and record the purported Notice of Default.

172.   Accordingly, Defendants Deutsche, Morgan Stanley and/or Wells Fargo are not entitled to utilize California Civil Code section 2924 et seq. (California's non-judicial foreclosure scheme) to wrongfully convert Plaintiffs' Property.

173.   On information and belief, Plaintiffs allege that said Defendants also failed to give proper notice of the Notice of Defaults, which apparently were recorded on or about May 27, 2009 and January 28, 2011.  Said failures are in direct violation of the notice and recording requirements set forth in California Civil Code section 2923.5.  As a result, Plaintiffs were not properly informed regarding a pending substitution of trustee, and consequently could not exercise their rights to investigate the circumstances of the foreclosure proceedings.

174.   Plaintiffs further allege that both the Notice of Trustee's Sales are invalid not only because the Notice of Defaults failed to have any content in the existing declaration to show by admissible evidence full compliance, but also because the undersigned, NDEX West, LLC, did not have the authority to execute and record the Notice of Default.

175.    Despite Plaintiffs' efforts to explore foreclosure avoidance options, Defendants, and each of them, failed and refused to: 1) evaluate Plaintiffs' financial condition regarding foreclosure avoidance (2) advise Plaintiffs of their statutory rights to meet with Defendants regarding such foreclosure avoidance; and 3) advise Plaintiffs of the toll-free federal Department of Housing and Urban Development ("HUD") telephone number regarding counseling opportunities to avoid the subject foreclosure. Furthermore, Plaintiffs allege that Defendants reported their filing of the notice of default and foreclosure on the Subject Property to credit reporting agencies, and that such reporting has damaged Plaintiffs' credit and severely impaired Plaintiffs' ability to obtain consumer credit and home mortgage financing

WHEREFORE, Plaintiffs pray as follows:

1.    For compensatory, special, and general damages in an amount according to proof at trial, but not less than $5,000,000.00 against all Defendants;

2.    For punitive and exemplary damages in an amount to be determined by the Court against all Defendants;

3.    For an order compelling Defendants to remove any instrument, including the Assignment, which does or could be construed as constituting a cloud upon Plaintiffs' title to the Property;

4.    For a declaratory judgment finding that Defendants do not have any legally cognizable rights as to Plaintiffs, the Property, Plaintiffs' Promissory Note, Plaintiff's Deed of Trust, or any other matter based on contract or any of the documents prepared by Defendants, tendered to and executed by Plaintiffs;

5.    For the Court to issue an order restraining Defendants, their agents, or employees from continuing or initiating any action against the Property and enjoining Defendants, their agents, or employees from doing so during the pendency of this matter;

1    6.    For an order compelling Defendants to disgorge all amounts wrongfully

2    taken from Plaintiff and returning the same to Plaintiffs' interest thereon at the statutory

3    rate from the date the funds were first received from Plaintiffs;

4        7.    For costs of suit incurred herein;

5        8.    For reasonable attorneys' fees incurred; and

6        9.    For such other and further relief as the Court may deem proper.

7

8    Dated:    December 22, 2011                    **PROSPER LAW GROUP, LLP**

9

10                                        By:    _____

11                                            Gordon F. Dickson
                                              Deborah P. Gutierrez
12                                            Vincent C. Granberry
                                              Attorneys for Plaintiffs,
13                                            Michael and Jeanine Rittenberg

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## DEMAND FOR JURY TRIAL

2      Plaintiffs Michael and Jeanine Rittenberg hereby demand a trial by jury on all

3  claims.

4

5  Dated:      December 22, 2011        **PROSPER LAW GROUP, LLP**

6

7

8                  By:   _Vincent Granberry_

9                        Gordon F. Dickson

                        Deborah P. Gutierrez

10                        Vincent C. Granberry

                      Attorneys for Plaintiffs,

11                        Michael and Jeanine Rittenberg

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

## Securitization Structure



# EXHIBIT B

Select borrower type and enter borrower information to see Investor for MIN 1000779-1000689462-6.

◉ Investor for Individual Borrower

Your entries may be either upper or lower case.
Fields marked are required.

\* Last Name: Rittenberg

\* SSN: 552 - 29 - 9246

\* ☐ By checking this box, the borrower or borrower's authorized representative is attesting to the fact that he or she is in fact the borrower or borrower's authorized representative for the loan in question. Additionally, borrowers wishing to learn the identity of their loan's investor must confirm their identity by entering their last name or corporation name as well as their SSN or TIN. If this information does not match the information contained in the MERS® System for the borrower of the loan, the investor information will not be displayed. Borrowers should verify the results with their loan servicer.

\* [Submit]

○ Investor for Corporation/Non-Person Entity Borrower

Your entries may be either upper or lower case.
Fields marked are required.

\* Corporation/Non-Person Entity Name: [                              ]

\* Taxpayer Identification Number: [            ]

\* ☐ By checking this box, the borrower or borrower's authorized representative is attesting to the fact that he or she is in fact the borrower or borrower's authorized representative for the loan in question. Additionally, borrowers wishing to learn the identity of their loan's investor must confirm their identity by entering their last name or corporation name as well as their SSN or TIN. If this information does not match the information contained in the MERS® System for the borrower of the loan, the investor information will not be displayed. Borrowers should verify the results with their loan servicer.

\* [Submit]

Servicer:   Wells Fargo Bank, N.A., d/b/a America's Servicing
Company                                                          Phone: (651) 605-3711

            Minneapolis, MN

Investor:   Morgan Stanley Mortgage Capital Holdings, LLC
-------------------------------------------------------------------------------

[Close Window]

**EXHIBIT C**

**Section 10.03 Governing Law.**

THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE SUBSTANTIVE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED IN THE STATE OF NEW YORK AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HERETO AND THE CERTIFICATEHOLDERS SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS

# EXHIBIT D



Congressional Oversight Panel

November 16,
2010

# NOVEMBER OVERSIGHT REPORT[*]

Examining the Consequences of Mortgage
Irregularities for Financial Stability and Foreclosure
Mitigation

[*]Submitted under Section 125(b)(1) of Title 1 of the Emergency Economic
Stabilization Act of 2008, Pub. L. No. 110-343

# Table of Contents

Executive Summary ..................................................................................................4

Section One:

   A.  Overview ..................................................................................................7

   B.  Background ..............................................................................................9

   C.  Timeline ................................................................................................10

   D.  Legal Consequences of Document Irregularities ...............................14

      1.  Potential Flaws in the Recording and Transfer of Mortgages and
         Violations of Pooling and Servicing Agreements .........................16

      2.  Possible Legal Consequences of the Document Irregularities to
         Various Parties ...............................................................................24

      3.  Additional Considerations ............................................................33

   E.  Court Cases and Litigation ...................................................................34

      1.  Fraud Claims ................................................................................35

      2.  Existing and Pending Claims under Various Fraud Theories ..........40

      3.  Other Potential Claims .................................................................42

      4.  Other State Legal Steps .................................................................44

      5.  Other Possible Implications: Potential "Front-end" Fraud and
         Documentation Irregularities .......................................................46

   F.  Assessing the Potential Impact on Bank Balance Sheets ....................51

      1.  Introduction ..................................................................................51

      2.  Foreclosure Irregularities: Estimating the Cost to Banks ...............59

      3.  Securitization Issues and Mortgage Put-backs .............................63

G.  Effect of Irregularities and Foreclosure Freezes on Housing Market ................... 73

    1.  Foreclosure Freezes and their Effect on Housing ............................. 73

    2.  Foreclosure Irregularities and the Crisis of Confidence ...................... 78

H.  Impact on HAMP ............................................................................... 79

I.  Conclusion .......................................................................................... 82

Section Two: Correspondence with Treasury ................................................... 85

Section Three: TARP Updates Since Last Report ........................................... 86

Section Four: Oversight Activities .................................................................. 122

Section Five: About the Congressional Oversight Panel .................................. 124

Appendices:

    APPENDIX I: LETTER FROM CHAIRMAN TED KAUFMAN TO
    SPECIAL MASTER PATRICIA GEOGHEGAN, RE: FOLLOW UP TO
    EXECUTIVE COMPENSATION HEARING, DATED NOVEMBER 1, 2010 ...... 125

### iii. Mortgage Securitization Process

**Figure 1: Transfer of Relevant Paperwork in Securitization Process[36]**



Securitizations of mortgages require multiple transfers, and, accordingly, multiple assignments. Mortgages that were securitized were originated through banks and mortgage brokers – mortgage originators. Next they were securitized by investment banks – the sponsors – through the use of special purpose vehicles, trusts that qualify for Real Estate Mortgage Investment Conduit (REMIC) status. These trusts are bankruptcy-remote, tax-exempt vehicles that pooled the mortgages transferred to them and sold interests in the income from those mortgages to investors in the form of shares. The pools were collateralized by the underlying real property, because a mortgage represents a first-lien security interest on an asset in the pool – a house.[37] A governing document for securitizations called a pooling and servicing agreement (PSA) includes various representations and warranties for the underlying mortgages. It also describes the responsibilities of the trustee, who is responsible for holding the recorded mortgage

---

[36] FBR Foreclosure Mania Conference Call, *supra* note 3.

[37] For an overview of REMICs, *see* Federal National Mortgage Association, *Basics of REMICs* (June 16, 2009) (online at www.fanniemae.com/mbs/mbsbasics/remic/index.jhtml). *See also* Internal Revenue Service, *Final Regulations Relating to Real Estate Mortgage Investment Conduits*, 26 CFR § 1 (Aug. 17, 1995) (online at www.irs.gov/pub/irs-regs/td8614.txt). Only the MBS investors are taxed on their income from the trusts' payments on the MBS. REMICs are supposed to be passive entities. Accordingly, with few exceptions, a REMIC may not receive new assets after 90 days have passed since its creation, or there will be adverse tax consequences. Thus, if a transfer of a loan was not done correctly in the first place, proper transfer now could endanger the REMIC status. For an overview of residential mortgage-backed securities in general, *see* American Securitization Forum, *ASF Securitization Institute: Residential Mortgage-Backed Securities* (2006) (online at www.americansecuritization.com/uploadedFiles/RMBS%20Outline.pdf).

18

documents, and of the servicer, who plays an administrative role, collecting and disbursing mortgage and related payments on behalf of the investors in the MBS.

As described above, in order to convey good title into the trust and provide the trust with both good title to the collateral and the income from the mortgages, each transfer in this process required particular steps.[38] Most PSAs are governed by New York law and create trusts governed by New York law.[39] New York trust law requires strict compliance with the trust documents; any transaction by the trust that is in contravention of the trust documents is void, meaning that the transfer cannot actually take place as a matter of law.[40] Therefore, if the transfer for the notes and mortgages did not comply with the PSA, the transfer would be void, and the assets would not have been transferred to the trust. Moreover, in many cases the assets could not now be transferred to the trust.[41] PSAs generally require that the loans transferred to the trust not be in default, which would prevent the transfer of any non-performing loans to the trust now.[42] Furthermore, PSAs frequently have timeliness requirements regarding the transfer in order to ensure that the trusts qualify for favored tax treatment.[43]

Various commentators have begun to ask whether the poor recordkeeping and error-filled work exhibited in foreclosure proceedings, described above, is likely to have marked earlier stages of the process as well. If so, the effect could be that rights were not properly transferred during the securitization process such that title to the mortgage and the note might rest with another party in the process other than the trust.[44]

iv. MERS

In addition to the concerns with the securitization process described above, a method adopted by the mortgage securitization industry to track transfers of mortgage servicing rights has come under question. A mortgage does not need to be recorded to be enforceable as between the mortgagor and the mortgagee or subsequent transferee, but unless a mortgage is recorded, it does not provide the mortgagee or its subsequent transferee with priority over subsequent mortgagees or lien holders.[45]

---

[38] See Section D.1.a.ii, *supra.*

[39] FBR Foreclosure Mania Conference Call, *supra* note 3.

[40] N.Y. Est. Powers & Trusts Law § 7-2.4; FBR Foreclosure Mania Conference Call, *supra* note 3.

[41] FBR Foreclosure Mania Conference Call, *supra* note 3.

[42] Amended Complaint at Exhibit 5, page 13, *Deutsche Bank National Trust Company v. Federal Deposit Insurance Corporation*, No. 09-CV-1656 (D.D.C. Sept. 8, 2010) (hereinafter "Deutsche Bank v. Federal Deposit Insurance Corporation").

[43] *See* FBR Foreclosure Mania Conference Call, *supra* note 3.

[44] *See, e.g.,* FBR Foreclosure Mania Conference Call, *supra* note 3.

[45] Restatement (Third) of Prop. (Mortgages) § 5.4 cmt. B (1997).

# EXHIBIT E

**Section 2.01 Conveyance of Mortgage Loans.**

(a) The Depositor, concurrently with the execution and delivery hereof, hereby sells, transfers, assigns, sets over and otherwise conveys to the Trustee for the benefit of the Certificateholders, without recourse, all the right, title and interest of the Depositor in and to the Trust Fund, and the Trustee, on behalf of the Trust, hereby accepts the Trust Fund.

(b) In connection with the transfer and assignment of each Mortgage Loan, the Depositor has delivered or caused to be delivered to Wells Fargo, in its capacity as Custodian, with respect to the WMC Mortgage Loans, LaSalle with respect to the Decision One Mortgage Loans and to the Trustee with respect to the NC Capital Mortgage Loans, for the benefit of the Certificateholders the following documents or instruments with respect to each Mortgage Loan so assigned:

(i) the original Mortgage Note bearing all intervening endorsements, endorsed *"Pay to the order of _____, without recourse"* and signed (which may be by facsimile signature) in the name of the last endorsee by an authorized officer. To the extent that there is no room on the face of the Mortgage Note for endorsements, the endorsement may be contained on an allonge, unless the Trustee or applicable Custodian, as applicable, is advised in writing by the applicable Responsible Party (if required by the applicable Purchase Agreement) or the Depositor that state law does not so allow;

(ii) the original of any guaranty executed in connection with the Mortgage Note, if any;

(iii) the original Mortgage with evidence of recording thereon or a certified true copy of such Mortgage submitted for recording. If, in connection with any Mortgage Loan, the original Mortgage cannot be delivered with evidence of recording thereon on or prior to the Closing Date because of a delay caused by the public recording office where such Mortgage has been delivered for recordation or because such Mortgage has been lost or because such public recording office retains the original   recorded Mortgage, the applicable Responsible Party shall deliver or cause to be delivered to the Trustee or applicable Custodian, as applicable, a photocopy of such Mortgage certified by the applicable Responsible Party, originator, the Depositor, title company, escrow company or attorney, as applicable, to be a true and complete copy of such Mortgage and shall forward to the Trustee or applicable Custodian, as applicable, such original recorded Mortgage within 14 days following the applicable  Responsible Party's receipt of such Mortgage from the applicable public recording office; or in the case of a Mortgage where a public recording office retains the original recorded Mortgage or in the case where a Mortgage is lost after recordation in a public recording office, a copy of such Mortgage certified by such public recording office to be a true and complete copy of the original recorded Mortgage;

(iv) the originals of all assumption, modification, consolidation or extension agreements, with evidence of recording thereon or a certified true copy of such agreement submitted for recording;

(v) the original Assignment of Mortgage for each Mortgage Loan endorsed in blank, which may, except with respect to the WMC Mortgage Loans, be included in a blanket assignment or assignments (except with respect to MERS Designated Mortgage Loans);

(vi) the originals of all intervening assignments of Mortgage (if any) evidencing a complete chain of assignment from the applicable originator (or MERS with respect to each MERS Designated Mortgage Loan) to the last endorsee with evidence of recording thereon or a certified true copy of such intervening assignments of Mortgage submitted for recording, or if any such intervening assignment has not been returned from the applicable recording office or has been lost or if such public recording office retains the original recorded assignments of Mortgage, the applicable Responsible Party shall deliver or cause to be delivered a photocopy of such intervening assignment, certified by the applicable Responsible Party, originator, Depositor, title company, escrow company or attorney, as applicable, to be a true and complete copy of such intervening assignment and shall forward to the Trustee or applicable Custodian, as applicable, such original recorded intervening assignment within 14 days following the applicable Responsible Party's receipt of such from the applicable public recording office; or in the case of an intervening assignment where a public recording office retains the original recorded intervening assignment or in the case where an intervening assignment is lost after recordation in a public recording office, a copy of such intervening assignment certified by such public recording office to be a true and complete copy of the original recorded intervening assignment;

(vii) the original mortgagee title insurance policy, a photocopy of the mortgage title insurance policy, or attorney's opinion of title and abstract of title, or, in the event such title policy is unavailable, a   copy of the related policy binder or commitment for title from the title insurance company; and

(viii) the original of any security agreement, chattel mortgage or equivalent document executed in connection with the Mortgage (if provided).

The applicable Responsible Party shall cause to be delivered to the Trustee or applicable Custodian, as applicable, the applicable recorded document promptly upon receipt from the respective recording office.

If any Mortgage has been recorded in the name of Mortgage Electronic Registration System, Inc. ("_MERS_") or its designee, no Assignment of Mortgage in favor of the Trustee will be required to be prepared or delivered and instead, the applicable Servicer shall take all reasonable actions as are necessary at the expense of the applicable Responsible Party to cause the Trust to be shown as the

owner of the related Mortgage Loan on the records of MERS for the purpose of the system of recording transfers of beneficial ownership of mortgages maintained by MERS.

From time to time, the Depositor or the applicable Servicer, as applicable, shall forward to the Trustee or applicable Custodian, as applicable, additional original documents, additional documents evidencing an assumption, modification, consolidation or extension of a Mortgage Loan in accordance with the terms of this Agreement upon receipt of such documents. All such mortgage documents held by the Trustee or applicable Custodian, as applicable, as to each Mortgage Loan shall constitute the "*Custodial File*".

On or prior to the Closing Date, each Responsible Party shall deliver to the applicable Custodian Assignments of Mortgages, in blank, for each Mortgage Loan. The Responsible Parties shall cause the Assignments of Mortgages and complete recording information to be provided to the applicable Servicer in a reasonably acceptable manner. No later than thirty (30) Business Days following the later of the Closing Date and the date of receipt by the applicable Servicer of the complete recording information for a Mortgage, the applicable Servicer shall promptly submit or cause to be submitted for recording, at the expense of the applicable Responsible Party as required pursuant to the related Purchase Agreement and at no expense to the Trust Fund, the Trustee, the applicable Servicer, or the Depositor, in the appropriate public office for real property records, each Assignment of Mortgage referred to in Section 2.01(b)(v). Notwithstanding the foregoing, however, for administrative convenience and facilitation of servicing and to reduce closing costs, the Assignments of Mortgage shall not be required to be completed and submitted for recording with respect to any Mortgage Loan (i) if the Trustee, the Custodians and each Rating Agency have received an Opinion of Counsel, satisfactory in form and substance to the Trustee and each Rating Agency to the effect that the recordation of such Assignments of Mortgage in any specific jurisdiction is not necessary to protect the Trustee's interest in the related Mortgage Note, (ii) if such Mortgage Loan is a MERS Designated Mortgage Loan or (iii) if the Rating Agencies have each notified the Depositor in writing that not recording any such Assignments of Mortgage would not cause the initial ratings on any LIBOR Certificates to be downgraded or withdrawn; provided, however, that no Servicer shall be held responsible or liable for any loss that occurs because an Assignment of Mortgage was not recorded, but only to the extent the applicable Servicer does not have prior knowledge of the act or omission that causes such loss. Unless the Depositor gives the Servicers notice to the contrary, the Depositor is deemed to have given the Servicers notice that the condition set forth in clause (iii) above is applicable. However, with respect to the Assignments of Mortgage referred to in clauses (i) and (ii)  above, if foreclosure proceedings occur against a Mortgaged Property, the applicable Servicer shall record such Assignment of Mortgage at the expense of the applicable Responsible Party (and at no expense to such Servicer) as required pursuant to the related Purchase Agreement. If the Assignment of Mortgage is to be recorded, the Mortgage shall be assigned to "*Deutsche Bank  National Trust Company, as trustee under the Pooling and Servicing Agreement dated as of February 1, 2007, Morgan Stanley ABS Capital I Inc. Trust 2007-HE2.*" In the event that any such Assignment of Mortgage is lost or returned unrecorded because of a defect therein, the applicable Responsible Party shall promptly cause to be delivered a substitute Assignment of Mortgage to cure such defect  and thereafter cause each such assignment to be duly recorded.

In the event that such original or copy of any document submitted for recordation to the appropriate public recording office is not so delivered to the applicable Custodian within one year following the date such Mortgage Loan was sold by such Responsible Party to the Sponsor, and in the event that such Responsible Party does not cure such failure within 30 days of discovery or receipt of written notification of such failure from the Depositor, the related Mortgage Loan shall, upon the request of the Depositor, be repurchased by such Responsible Party at the price and in the manner specified in Section 2.03. The foregoing repurchase obligation shall not apply in the event that the applicable Responsible Party cannot deliver such original or copy of any document submitted for recordation to the appropriate public recording office within the specified period due to a delay caused by the recording office in the applicable jurisdiction; provided, that such Responsible Party shall instead deliver a recording receipt of such recording office or, if such recording receipt is not available, an officer's certificate of an officer of such Responsible Party, confirming that such document has been accepted for recording.

Notwithstanding anything to the contrary contained in this Section 2.01, in those instances where the public recording office retains or loses the original Mortgage or assignment after it has been recorded, the obligations of the applicable Responsible Party shall be deemed to have been satisfied upon delivery by the applicable Responsible Party to the applicable Custodian prior to the Closing Date of a copy of such Mortgage or assignment, as the case may be, certified (such certification to be an original thereof) by the public recording office to be a true and complete copy of the recorded original thereof.

On or prior to the Closing Date, the Depositor shall deliver to the Trustee and the Custodians, as applicable, a copy of the Data Tape Information in an electronic, machine readable medium in a form acceptable to the Depositor, the Trustee or the Custodians, as applicable.

(c) The Depositor does hereby establish, pursuant to the further provisions of this Agreement and the laws of the State of New York, an express trust (the "*Trust*") to be known, for convenience, as "*MORGAN STANLEY ABS CAPITAL I INC. TRUST 2007-HE2*" and Deutsche Bank National Trust Company is hereby appointed as Trustee in accordance with the provisions of this Agreement. The parties hereto acknowledge and agree that it is the policy and intention of the Trust to acquire only Mortgage Loans meeting the requirements set forth in this Agreement, including without limitation, the representations and warranties set forth in paragraph (aaa) of Schedule IV, paragraph (yy) of Schedule VI and paragraph (aaa) of Schedule VII to this Agreement. The Trust's fiscal year is the calendar year.

(d) The Trust shall have the capacity, power and authority, and the Trustee on behalf of the Trust is hereby authorized, to accept the sale, transfer, assignment, set over and conveyance by the Depositor to the Trust of all the right, title and interest of the Depositor in and to the Trust Fund (including, without limitation, the Mortgage Loans and the Representations and Warranties Agreement) pursuant to Section 2.01(a). The Trustee on behalf of the Trust is hereby directed to enter into the Interest Rate Swap Agreement.

(e) The Depositor shall use reasonable effort to assist the Trustee in enforcing the obligations of the Sponsor under the Representations and Warranties Agreement.

**Section 2.02 Acceptance by the Trustee of the Mortgage Loans.**

The Trustee and the Custodians shall acknowledge, on the Closing Date, receipt by the Trustee or the applicable Custodian, as applicable, on behalf of the Trustee of the documents identified in the Initial Certification in the form annexed hereto as Exhibit E, and declares that it holds and will hold such documents and the other documents delivered to it pursuant to Section 2.01, and that it holds or will hold such other assets as are included in the Trust Fund, in trust for the exclusive use and benefit of all present and future Certificateholders. The Trustee and the Custodians shall maintain possession of the related Mortgage Notes in the States of California, Illinois, Minnesota or Utah unless otherwise permitted by the Rating Agencies. Furthermore, the Trustee solely in its capacity as trustee hereunder, and on behalf of the Trust, hereby assumes the obligations of the Depositor under the Representations and Warranties Agreement from and after the Closing Date and solely insofar as they relate to the Mortgage Loans.

As provided above, in connection with the Closing Date, the Trustee and the Custodians shall be required to deliver via facsimile or electronically in .pdf format (with original to follow the next Business Day) to the Depositor and the Servicers an Initial Certification on the Closing Date, certifying receipt of a Mortgage Note and Assignment of Mortgage for each applicable Mortgage Loan. Neither the Trustee nor the Custodians shall be responsible to verify the validity, sufficiency, genuineness, perfection or priority of any document in any Custodial File.

Within 90 days after the Closing Date, the Trustee and each Custodian shall, for the benefit of the Holders of the Certificates, ascertain that all documents identified in the Document Certification and Exception Report in the form attached hereto as Exhibit F with respect to the Mortgage Loans for which it is acting as the Custodian, are in its possession, and shall deliver to the Depositor, the Servicers and the Trustee, if delivered by a Custodian, a Document Certification and Exception Report, in the form annexed hereto as Exhibit F, to the effect that, as to each applicable Mortgage Loan listed in the Mortgage Loan Schedule (other than any Mortgage Loan paid in full or any Mortgage Loan specifically identified in such certification as an exception and not covered by such certification): (i) all documents identified in the Document Certification and Exception Report and required to be reviewed by it are in its possession; (ii) such documents have been reviewed by it and appear regular on their face and relate to such Mortgage Loan; (iii) based on its examination and only as to the foregoing documents, the information set forth in items (1), (2),(7) and (9) of the Mortgage Loan Schedule and items (1), (9) and (17) of the Data Tape Information respecting such Mortgage Loan accurately reflects the information set forth in the Custodial File; and (iv) each Mortgage Note has been endorsed as provided in Section 2.01 of this Agreement. Neither the Trustee nor the Custodians shall be responsible to verify the validity, sufficiency or genuineness of any document in any Custodial File.

Within 90 days after the Closing Date, the applicable Servicer (for the benefit of the Holders of the Certificates, based solely on the list of MERS Designated Mortgage Loans and screen printouts from the MERS(R) System provided to such Servicer by each applicable Responsible Party no later than 45 days after the Closing Date) shall confirm, on behalf of the Trust, that the Trustee is shown as the Investor with respect to each MERS Designated Mortgage Loan on such screen printouts. If the Trustee is not shown as the Investor with respect to any MERS Designated Mortgage Loans on such screen printouts, the applicable Servicer shall promptly notify the applicable Responsible Party of such fact, and such Person shall then either cure such defect or repurchase such Mortgage Loan in accordance with Section 2.03.

The Trustee and the Custodians shall retain possession and custody of each applicable Custodial File in accordance with and subject to the terms and conditions set forth herein. The applicable Servicer shall promptly deliver to the Trustee or the applicable Custodian, as applicable, upon the execution or receipt thereof, the originals of such other documents or instruments constituting the Custodial File as come into the possession of such Servicer from time to time.

Each Responsible Party shall deliver to the applicable Servicer copies of all trailing documents required to be included in the Custodial File at the same time the original or certified copies thereof are delivered to the Trustee or the applicable Custodian, as applicable, including but not limited to such documents as the title insurance policy and any other Mortgage Loan Documents upon return from the public recording office. Such documents shall be delivered by the applicable Responsible Party at such Responsible Party's expense to such Servicer.

# EXHIBIT F




**This page is part of your document - DO NOT DISCARD**



# 20090974625



Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

**06/29/09 AT 08:00AM**

Pages:
0002

| FEES: | 12.00 |
|-------|-------|
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| PAID: | 12.00 |



**L E A D S H E E T**



200906290210011

**00000778803**



002178464

**SEQ:**
**06**

DAR - Title Company (Hard Copy)



**THIS FORM IS NOT TO BE DUPLICATED**

E527952



t35

Recording requested by:
**LPS Default Title & Closing**

When Recorded Mail To:
**NDEx West, L.L.C.**
**15000 Surveyor Boulevard, Suite 500**
**Addison, Texas 75001-9013**


06/29/2009

*20090974625*

ASSG20090134005803

Space above this line for Recorder's use only

Trustee Sale No. : **20090134005803**    Title Order No.: **090367992**

## ASSIGNMENT OF DEED OF TRUST

FOR VALUE RECEIVED, the undersigned hereby grants, assigns and transfers to DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE FOR MORGAN STANLEY ABS CAPITAL I INC. TRUST 2007-HE2 all beneficial interest under that certain Deed of Trust dated **09/18/2006**, executed by **MIKE RITTENBERG AND JEANINE RITTENBERG**, as Trust or to OLD REPUBLIC NATIONAL TITLE INS, Trustee, and Recorded on **09/27/2006 as Instrument No. 06 2147792** of Official Records in the County Recorder's office of **LOS ANGELES** County, California. Describing land therein: **AS DESCRIBED IN DEED OF TRUST MENTIONED ABOVE.**

Together with the note or notes therein described or referred to, the money due and to become due thereon with interest, and all rights accrued or to accrue under said Deed of Trust.

Dated

JUN 1 2 2009

MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC. AS NOMINEE FOR DECISION
ONE MORTGAGE COMPANY, LLC

David Seybold, Assistant Secretary

State of     Texas}
County of   Dallas} ,

Before me:  , the undersigned Notary Public, on this day personally appeared David Seybold, who is the Assistant Secretary of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR DECISION ONE MORTGAGE COMPANY, LLC, a corporation, on behalf of said corporation, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ day of JUN 1 2 2009 _____, 2009.

My Commission Expires:

Notary Public Signature

SONIA CARDONA
Notary Public
State of Texas
My Comm. Exp. 06-20-2011

Printed Name of Notary Public

# EXHIBIT G



# PROSPER LAW

**PROSPER LAW GROUP, LLP**
6100 CENTER DRIVE
SUITE 1050
LOS ANGELES, CA 90045
—
TELEPHONE: (310) 893-6200
FAX: (310) 988-2930
WEBSITE: www.prosperlaw.com

GORDON F. DICKSON
DEBORAH P. GUTIERREZ
DONNY E. BRAND
HAZEL S. CHU
MICHAEL E. THOMPSON
VINCENT C. GRANBERRY
—

OF COUNSEL:
RICHARD M. GEE ♦
KEITH R. OLIVER
CARLOS A. LLARENA
MICHAEL KIM
MARYANNE PITCHER

♦ MEMBER CA & CO BARS

ADMINISTRATOR:
ROBYN NAKAGAWA

SAN FRANCISCO OFFICE
—
450 HARRISON STREET, SUITE 310
SAN FRANCISCO, CALIFORNIA 94105

SAN DIEGO OFFICE
—
701 B STREET, SUITE 234
SAN DIEGO, CALIFORNIA 92101

December 6, 2011

<u>**Via US Certified Mail #7011 2000 0000 5402 7304**</u>
America's Servicing Company
Loss Mitigation
300 St Paul Place
Baltimore, MD 21202

Re:   <u>**QUALIFIED WRITTEN REQUEST**</u>
      **Loan Number:** 1127126386
      **Our Client:** Michael Rittenberg
      **Property Address:** 17954 Petrel Ct., Santa Clarita, CA 91387

**This letter is a "qualified written request" in compliance with and under the Real Estate Settlement Procedures Act, 12 U.S.C. Section 2605(e).**

To Whom It May Concern:

Please be advised this office has been retained by Michael Rittenberg ("Mr. Rittenberg") in regards to the accounting and servicing of this loan and the need for understanding and clarification of various sales, transfers, funding sources, legal and beneficial ownership, charges, credits, debits, transactions, reversals, actions, payments, analyses and records related to the servicing of this account from its origination to the present date.  The subject property is located at 17954 Petrel Ct., Santa Clarita, CA 91387.

     This letter concerns sales and transfers of mortgage servicing rights; deceptive and fraudulent servicing practices to enhance balance sheets; deceptive, abusive, and fraudulent accounting tricks and practices that may have also negatively affected any credit rating, mortgage account and/or the debt or payments that my clients may be legally obligated to.

     **In accordance with RESPA and Section 131(f) of the Truth-in-Lending Act, 15 U.S.C. Section 1641(f)(2), please provide the following information:**

1.   A true and present copy of the promissory note and deed of trust;

2. A complete life of loan transactional history;

3. The Transaction Codes for the software platform of the Servicer;

4. The Code definitions in plain English;

5. The Key Loan Transaction history, bankruptcy work sheet (if any), or any summary of all of the accounts in an XL spreadsheet format;

6. The MERS Milestone Reports and the Edgar website address for the Pooling and Servicing Agreement, Prospectus and Prospectus Supplement;

7. The name, address, name of a contact person and telephone number of the current holder in due course and owner of the mortgage note;

8. Copies of all collection notes and communications files;

9. An itemized statement of the amount needed to fully reinstate the loan;

10. All communications with any non-lawyer third-party providers; and

11. All Form P-309 screen shots of all system accounts (principal, interest, escrow, late charges, legal fees, property inspection fees, property preservation fees, broker price opinion fees, statutory expense fees, miscellaneous fees, corporate advance fees, trustee suspense accounts, debtor suspense accounts) associated with the loan.

Under RESPA, this information must be provided and cannot be claimed as "confidential," "proprietary," or otherwise private. Failure to disclose the requested information will be considered failure to comply with this Qualified Written Request and thus a violation of 15 U.S.C. section 1601.

I also hereby demand that a chain of transfer from AMERICA'S SERVICING COMPANY to wherever the security currently is be promptly sent to my office. Absent the actual evidence of the security, Mr. Rittenberg has no choice but to dispute the validity of AMERICA'S SERVICING COMPANY's lawful ownership, funding, entitlement right, and the current debt AMERICA'S SERVICING COMPANY claims Mr. Rittenberg owes. By debt I am referring to the principal balance AMERICA'S SERVICING COMPANY claims Mr. Rittenberg owes; the calculated monthly payment, calculated escrow payment and any fees claimed to be owed by AMERICA'S SERVICING COMPANY or any trust or entity AMERICA'S SERVICING COMPANY may service or sub-service for.

To independently validate this debt, my office needs to conduct a complete exam, audit, review and accounting of this mortgage account from its inception through the present date. Upon receipt of this letter, please refrain from reporting any negative credit information (if any) to any credit-reporting agency until responses are provided to each of the requests.

I also request that AMERICA'S SERVICING COMPANY conduct AMERICA'S SERVICING COMPANY's own investigation and audit of this account since its inception to validate the debt AMERICA'S SERVICING COMPANY currently claims Mr. Rittenberg owes. I would like AMERICA'S SERVICING COMPANY to validate the debt so that it is accurate.

Please be aware that potential abuses by AMERICA'S SERVICING COMPANY or previous servicing companies could have deceptively, wrongfully, unlawfully, and/or illegally:

Los Angeles          San Francisco          San Diego

- Increased the amounts of monthly payments;
- Increased the principal balance Mr. Rittenberg owes;
- Increased the escrow payments;
- Increased the amounts applied and attributed toward interest on this account;
- Decreased the proper amounts applied and attributed toward the principal on this account; and/or;
- Assessed, charged and/or collected fees, expenses and miscellaneous charges Mr. Rittenberg is not legally obligated to pay under this mortgage, note and/or deed of trust.

Again, this is a Qualified Written Request under the Real Estate Settlement Procedures Act, codified as Title 12 section 2605(e) of the United States Code as well as a request under the Truth In Lending Act 15 U.S.C. section 1601. RESPA provides substantial penalties and fines for non-compliance or failure to answer the questions provided in this letter within sixty (60) days of its receipt.

Upon receipt of the documents and answers, an exam and audit will be conducted that may lead to a further document request and answers to questions under an additional RESPA Qualified Written Request letter.

**Default Provisions under this QUALIFIED WRITTEN REQUEST**

AMERICA'S SERVICING COMPANY or any agents, transfers, or assigns' omissions of, or agreement by silence to this RESPA REQUEST via certified rebuttal of any and all points herein this RESPA REQUEST, agrees and consents to, including but not limited by, any violations of law and/or immediate termination and/or removal of any and all right, title and interest (liens) in Mr. Rittenberg's, or any property or collateral, connected to Mr. Rittenberg's or loan number 1127126386, and waives any and all immunities and/or defenses to claims and/or violations agreed to in this RESPA REQUEST, including but not limited to:

1.  Mr. Rittenberg's right to, by AMERICA'S SERVICING COMPANY's breach of fiduciary responsibility, fraud, and/or misrepresentation, revoke and rescind any and all power of attorney or appointment AMERICA'S SERVICING COMPANY may have or may have had in connection with loan number 1127126386, and any property and/or real estate connected with loan number 1127126386;

2.  Mr. Rittenberg's right to have any certificated or uncertificated security re-registered in Mr. Rittenberg's, and only Mr. Rittenberg's name;

3.  Mr. Rittenberg's right of collection via AMERICA'S SERVICING COMPANY's liability insurance and/or bond;

4.  Mr. Rittenberg's entitlement in filing and executing any instruments, as power of attorney for and by AMERICA'S SERVICING COMPANY ,including but not limited to a new certificated security or any security agreement perfected by filing a UCC Financing Statement with the Secretary of State in the State where AMERICA'S SERVICING COMPANY is located;

5.  AMERICA'S SERVICING COMPANY's right to damages because of AMERICA'S SERVICING COMPANY's wrongful registration and breach of intermediary responsibility with regard to Mr.

Rittenberg's asset, by way of AMERICA'S SERVICING COMPANY issuing to Mr. Rittenberg a certified check for the original value of Mr. Rittenberg's monetary instrument;

6.     Mr. Rittenberg's right to have loan number 1127126386 completely set off because of AMERICA'S SERVICING COMPANY's wrongful registration and breach of intermediary responsibility with regard to Mr. Rittenberg's monetary instrument/asset by AMERICA'S SERVICING COMPANY's sending confirmation of set off of wrongful liability of Mr. Rittenberg and issuing a certified check for the difference between the original value of Mr. Rittenberg's monetary instrument/asset and what Mr. Rittenberg mistakenly sent to AMERICA'S SERVICING COMPANY as a payment for such wrongful liability.

AMERICA'S SERVICING COMPANY or any of AMERICA'S SERVICING COMPANY's transfers, agents or assigns offering a rebuttal of this RESPA REQUEST must do so in the manner of this RESPA REQUEST in accordance of and in compliance with current statutes and/or laws - signing in the capacity of a fully liable man or woman being responsible and liable under the penalty of perjury, while offering direct testimony with the official capacity as appointed agent for AMERICA'S SERVICING COMPANY in accordance with AMERICA'S SERVICING COMPANY's Articles of Incorporation, by-laws duly signed by a current and duly sworn under oath director(s) of such corporation/ Holding Corporation/ National Association.

Any direct rebuttal with certified true and complete accompanying proof must be posted with the Notary address herein within sixty days.  When no verified rebuttal of this RESPA REQUEST is made in a timely manner, a "Certificate of Non-Response" serves as AMERICA'S SERVICING COMPANY's judgment and consent/agreement by means of silence with any and all claims and/or violations herein-stated in the default provisions or any other law.

You should be advised that you must acknowledge receipt of this request within five (5) business days, and respond within thirty (30) business days, pursuant to 12 U.S.C. Section 2605(e)(1)(A) as amended effective July 16, 2010 by the Dodd-Frank Financial Reform Act and Reg. X Section 3500.21(e)(1).

Power of Attorney: When AMERICA'S SERVICING COMPANY fails by not rebutting to any part of this RESPA REQUEST, AMERICA'S SERVICING COMPANY agrees with the granting unto Mr. Rittenberg unlimited Power of Attorney and any and all full authorization in signing and endorsing AMERICA'S SERVICING COMPANY's name upon any instruments in satisfaction of the obligations of this RESPA REQUEST/Agreement or any agreement arising from this agreement.  Pre-emption of or to any Bankruptcy proceeding shall not discharge any obligations of this agreement.  Consent and agreement with this Power of Attorney by AMERICA'S SERVICING COMPANY waives any and all claims and/or defenses of AMERICA'S SERVICING COMPANY, and remains in effect until the satisfaction of all obligations by AMERICA'S SERVICING COMPANY have been satisfied.

If you have any questions, please do not hesitate to contact my office.
Sincerely,

Deborah P. Gutierrez, Esq.

Los Angeles         San Francisco         San Diego

Page **5** of **5**

*Managing Partner*

DPG/slm

EXHIBIT H



This page is part of your document - DO NOT DISCARD

**06 2147792**

RECORDED/FILED IN OFFICIAL RECORDS
RECORDER'S OFFICE
LOS ANGELES COUNTY
CALIFORNIA
**09/27/06 AT 08:00am**

# TITLE(S) :



L E A D   S H E E T

**FEE**



FEE $5?.RR
DAF $2?
C-20        76

**D.T.T.**

NOTIFICATION SENT $4

**CODE
20**

**CODE
19**

**CODE
9____**

Assessor's Identification Number (AIN)
To be completed by Examiner OR Title Company in black ink.

**Number of AIN's Shown**

        **THIS FORM IS NOT TO BE DUPLICATED**        

FIRST SOUTHWESTERN
TITLE COMPANY

After Recording Return To:

**06 2147792**

Decision One Mortgage Company, LLC
3023 HSBC Way
Fort Mill, South Carolina 29715

——————————————— [Space Above This Line For Recording Data] ———————————————

Assessor's Identification Number

**DEED OF TRUST**

Loan Number 2360060924630
MIN: 100077910006894626

2841031003

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated **SEPTEMBER 18, 2006,** together with all Riders to this document.

(B) "Borrower" is **MIKE RITTENBERG AND JEANINE RITTENBERG, HUSBAND AND WIFE AS COMMUNITY PROPERTY.** Borrower is the trustor under this Security Instrument.

(C) "Lender" is **Decision One Mortgage Company, LLC.** Lender is a **LIMITED LIABILITY COMPANY** organized and existing under the laws of **NORTH CAROLINA.** Lender's address is **3023 HSBC WAY, FORT MILL, SOUTH CAROLINA 29715.**

(D) "Trustee" is **OLD REPUBLIC NATIONAL TITLE INS., 400 2nd Avenue South, Minneapolis, MINNESOTA 55401.**

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated **SEPTEMBER 18, 2006.** The Note states that Borrower owes Lender **FIVE HUNDRED TWENTY-EIGHT THOUSAND AND 00/100ths** Dollars (U.S.**$528,000.00**) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **OCTOBER 1, 2036.**

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3005  1/01 (page 1 of 12 pages)



|0000|4|-6|

3

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider      ☐ Condominium Rider      ☐ Second Home Rider

☐ Balloon Rider      ☒ Planned Unit Development Rider      ☐ Other(s) [specify]

☐ 1-4 Family Rider      ☐ Biweekly Payment Rider

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. § 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the _____ **County** _____ of _____ **LOS ANGELES** _____ :

           [Type of Recording Jurisdiction]          [Name of Recording Jurisdiction]

**SEE ATTACHED**

SEE ATTACHED EXHIBIT A



06 2147792

4

which currently has the address of __17954 WEST PETREL COURT__

                                                  [Street]

__SANTA CLARITA__ , California __91387__ ("Property Address"):
     [City]                                       [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3005  1/01 (*page 3 of 12 pages*)



**06 2147792**

5

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3005 1/01 *(page 4 of 12 pages)*



06 2147792



**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly.

CALIFORNIA–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT      Form 3005 1/01 *(page 5 of 12 pages)*

**06  2147792**

Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy

06 2147792

proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

   10.  Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a nonrefundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

   (a)  Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

   (b)  Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3005 1/01 *(page 7 of 12 pages)*



06 2147792

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3005 1/01 *(page 8 of 12 pages)*



06 2147792

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

06 2147792

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.



**06 2147792**

12

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Form 3005  1/01 *(page 11 of 12 pages)*



06 2147792

13

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.
Witnesses:

_____   _____ (Seal)
                                  MIKE RITTENBERG                ·Borrower

_____   _____ (Seal)
                                  JEANINE RITTENBERG             ·Borrower

_____ (Seal)   _____ (Seal)
                          ·Borrower                              ·Borrower

STATE OF CALIFORNIA,  LOS ANGELES                        County ss:

On _____ before me, _____
personally appeared  **MIKE RITTENBERG AND JEANINE RITTENBERG, HUSBAND AND WIFE AS COMMUNITY PROPERTY,** personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.
Witness my hand and official seal.
(This area for official notarial seal)                _____ (Seal)

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3005 1/01 *(page 12 of 12 pages)*



06 2147792

**General Acknowledgment**

STATE OF CALIFORNIA
COUNTY OF _Los Angeles_                          } ss.                                              14

On _September 19 06_ before me
_Jacqueline L. Benton_
a Notary Public in and for said County and State, personally
appeared _Mike Rittenberg &_
_Jeanine Rittenberg_

personally known to me (or proved to me on the basis of
satisfactory evidence) to be the person(s) whose name(s)
is/are subscribed to the within instrument and acknowledged
to me that he/she/they executed the same in his/her/their
authorized capacity(ies) and that by his/her/their signature(s)
on the instrument the person(s), or the entity upon behalf of
which the person(s), acted/executed the instrument.

WITNESS my hand and official seal.

Signature _____
              Signature of Notary


For Notary Seal or Stamp

JACQUELINE L. BENTON
Commission # 1570207
Notary Public - California
Los Angeles County
My Comm. Expires Apr 17, 2009

ATTENTION NOTARY: Although the information requested below is OPTIONAL, it could prevent fraudulent attachment of this certificate to another document

THIS CERTIFICATE MUST BE ATACHED
TO THE DOCUMENT DESCRIBED AT RIGHT:

Title of Type of Document _____
Number of Pages _____ Date of Document _____
Signer(s) Other Than Named Above _____

06 2147792

Loan Number 2360060924630

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this **18TH** day of **SEPTEMBER, 2006**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to **Decision One Mortgage Company, LLC** (the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

17954 WEST PETREL COURT, SANTA CLARITA, CALIFORNIA 91387
[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in_____

_____

(the "Declaration"). The Property is a part of a planned unit development known as_____

CANYON VIEW ESTATES FAIR OAKS
[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

**PUD COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. PUD Obligations.** Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the: (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

MULTISTATE PUD RIDER–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3150 1/01
(page 1 of 2 pages)



06 2147792

16

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_____ (Seal)
MIKE RITTENBERG                                          -Borrower

_____ (Seal)
JEANINE RITTENBERG                                      -Borrower

_____ (Seal)
                                                        -Borrower

MULTISTATE PUD RIDER--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3150 1/01
(page 2 of 2 pages)



06 2147792

FILE NO.:   10000141-61

17

## EXHIBIT "A"

LOT 14 OF TRACT NO. 47200-01 LOCATED IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 1234 PAGE(S) 13-26 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING THEREFROM; ALL OIL, OIL RIGHTS, NATURAL GAS RIGHTS, MINERAL RIGHTS, ALL OTHER HYDROCARBON SUBSTANCES BY WHATSOEVER NAME KNOWN, TOGETHER WITH APPURTENANT RIGHTS THERETO, WITHOUT HOWEVER, ANY RIGHT TO ENTER UPON THE SURFACE OF SAID LAND NOR ANY PORTION OF THE SUBSURFACE LYING BELOW A DEPTH OF 500 FEET, AS EXCEPTED OR RESERVED BY VARIOUS INSTRUMENTS OF RECORD, AS RECORDED IN THE OFFICE OF THE COUNTY RECORDER OF LOS ANGELES COUNTY, STATE OF CALIFORNIA.

EXCEPT THEREFROM 40% IN AND TO ALL OIL, GAS, GASOLINE OR OTHER HYDROCARBON SUBSTANCES IN, UNDER OR UPON SAID LAND OR ANY PART THEREOF, TOGETHER WITH THE RIGHT OF INGRESS AND EGRESS FOR THE PURPOSE OF REMOVING ANY OF SAID OIL, GAS, GASOLINE OR OTHER HYDROCARBON SUBSTANCES AND FOR THE PURPOSE OF DRILLING AN OIL OR GAS WELL UPON SAID LAND, AS RESERVED TO REMI F. NADEAU, HIS HEIRS, ASSIGNS AND SUCCESSORS IN INTEREST IN DEED FROM REMI E. NADEAU AND MARGUERITE M. NADEAU, HIS WIFE, TO REMI NADEAU, A SINGLE MAN, RECORDED AUGUST 26, 1941 AS INSTRUMENT NO. 1360 IN BOOK 18714, PAGE 141, OFFICIAL RECORDS.

A.P.N. 2841-031-003